[Sac. No. 2983.  In Bank.—February 20, 1920.]

# LINDSAY–STRATHMORE IRRIGATION DISTRICT (a Corporation), Petitioner, v. SUPERIOR COURT OF TULARE COUNTY et al., Respondents.

[1] DISQUALIFICATION OF JUDGE — ACTION TO ENJOIN PUMPING FROM UNDERGROUND FLOW OF RIVER—OWNERSHIP OF CITY LOT WITHIN DELTA—CONSIDERATION OF COMPLAINT.—In determining whether a judge of the superior court is disqualified from sitting or acting in an · action to restrain an irrigation district from pumping water from the underground flow of a river by reason of his ownership of a city lot within the delta of the river, allegations of the complaint to the effect that the waters penetrate the soil of the entire delta, including lands not belonging to any of the plaintiffs, that the water moistens and makes productive the soil of such lands of other parties, and that all of such lands require the continuance of the underflow, cannot be regarded as surplusage, where by other allegations the action is shown to have been brought for the benefit of all persons within the delta who have a like interest with the plaintiffs.

[2] ID.—PROHIBITION — PLEADING — ALLEGATION OF FACTS OUTSIDE OF COMPLAINT.—In a proceeding in prohibition to prevent further proceedings in an action on the ground that the judge was disqualified the petitioner has the right to show the disqualification by proper allegations and proof of facts not shown upon the face of the complaint.

[3] ID.—ABSENCE OF USE OF UNDERGROUND FLOW IMMATERIAL.—The disqualification of a judge to sit or act in an action to enjoin an irrigation district from pumping water from the underground flow of a river by reason of his ownership of a city lot within the river delta is not removed because he had not hitherto used the underground flow available in his lot and no showing was made that he had any intention of so doing, where the theory of the complaint was that all owners of lands within the delta had the right to use the flow beneath their respective lands at any time, even if it be admitted that the theory be erroneous.

[4] ID.—EXTENT OF DISQUALIFICATION—QUESTION OF LAW AS WELL AS FACT.—The disqualification of a judge to sit or act in an action in which he is interested extends to an interest in a question of law as well as to an interest in a question of fact if it affects or determines the interest of the judge in the subject matter involved.

1. Disqualification of judge by interest in legal question involved in litigation, note, Ann. Cas. 1917A, 1068.

[5] Pleading — Parties — Action Brought on Behalf of Others—
Right of Intervention.—Where an action is brought not alone
for the plaintiffs but for all other persons who have a like inter-
est with the plaintiffs, the persons thus represented are regarded
as *quasi* parties, and may intervene and make themselves actual
parties when necessary for the protection of their interests, and
they are bound by the decree.

[6] Disqualification of Judge—Action to Restrain Pumping Oper-
ations—Slight Injury to Property of Judge—Disqualification
not Removed.—The disqualification of a judge to sit or act in
an action to enjoin an irrigation district from pumping water
from the underground flow of a river by reason of his ownership
of a city lot within the river delta is not affected by the fact
that the injury to his lot from the pumping operations is so
slight that he could not obtain an injunction to restrain such
diversion.

[7] Injunction — Continuance of Acts — Inappreciable Immediate
Damage.—An injunction will lie to prevent a wrongful act if the
continuance of such acts will, in time, ripen into an easement
in favor of the defendant which will operate to deprive the plain-
tiff of the use of his property, or some part thereof, or where
it takes from him the substance of his estate, although the imme-
diate damage inflicted by the act is inappreciable.

[8] Disqualification of Judge—Extent of Interest in Subject Mat-
ter of Action.—If a judge has an interest in the subject matter of
the action, or has property which may be directly affected by the
result of the judgment that may be rendered therein, the court will
not consider the extent of the interest nor inquire into the effect it
would have on his rulings, since it is sufficient to disqualify him
if it is a certain, definable, pecuniary, or proprietary interest
or relation which will be directly affected by the judgment that
may be rendered.

[9] Id.—Disqualification of Judge—Right to Raise Question—
Lack of Estoppel.—The provisions of section 170 of the Code
of Civil Procedure clearly imply that there can be no estoppel
to raise the question of the disqualification of a judge to sit or
act in an action in which he has an interest in the subject mat-
ter, by the acts or conduct of a party, at least prior to final
judgment.

[10] Id.—Construction of Section 170, Code of Civil Procedure
—Re-enactments Without Amendment — Presumption as to
Legislative Intent.—In view of the fact that section 170 of the
Code of Civil Procedure has been several times re-enacted with-
out change, it must be presumed that the legislature intended it
to have the meaning and effect that had been given to it by
previous decisions of the supreme court.

[11] ID.—DISQUALIFICATION OF JUDGE—CONSENT OF PARTIES.—Where a judge is disqualified by reason of interest in the subject matter of the action, consent of parties cannot impart validity to the proceedings, and a party to the action who desires to attack them is not estopped from doing so by the fact that he attended during the trial without raising the objection.

[12] ID.—ACTION AGAINST IRRIGATION DISTRICT—DISQUALIFICATION OF JUDGE UNDER SUBDIVISION 5, SECTION 170, CODE OF CIVIL PROCEDURE.—A judge is disqualified to sit or act in an action to enjoin an irrigation district from pumping water from the underground flow of a river by reason of his ownership of a city lot within the river delta under subdivision 5 of section 170 of the Code of Civil Procedure, which declares that in an action or proceeding by or against the reclamation board of the state, or any reclamation, levee, swamp-land, or drainage district, or any public agency, or trustee, officer, or employee thereof, affecting or relating to any real property, the judge of the superior court of the county in which the property is situated shall be disqualified to sit or act, since the phrase "public agency" includes irrigation districts.

APPLICATION for Writ of Prohibition directed against the Superior Court of Tulare County and the judge thereof to prevent further proceedings in a pending action. Writ granted.

The facts are stated in the opinion of the court.

Sloss, Ackerman & Bradley, Power & McFadzean, W. G. Irving and L. L. Dennett for Petitioner.

Larkins & Bailey, Farnsworth & McClure and Wheaton A. Gray for Respondents.

SHAW, J.—This is a proceeding in prohibition begun in this court to prevent further proceedings in an action pending before Judge Wallace in the superior court of Tulare County wherein Tulare Irrigation District and many others, corporations and individuals, are plaintiffs and Lindsay-Strathmore Irrigation District is defendant.

The ground of this proceeding, stated generally, is that by reason of the ownership by Judge Wallace of a certain lot of land 85 feet by 123 feet in size situated in the city of Visalia, the action is one "in which he is interested" and consequently one in which, under the provisions of section

170 of the Code of Civil Procedure, he is forbidden to sit or act as judge.

Said action was begun in said superior court on July 16, 1916, and it has proceeded to trial before Judge Wallace, who has signed and filed his decision in writing, stating his findings of fact and conclusions of law upon the issues in the case. It is alleged that he has been the owner of said lot for more than thirty years last past and still remains such owner; that it is situated over subterranean waters which add substantial value to the said lot, and that the judgment sought by the plaintiffs in the action will have the effect of protecting his interest as owner of said lot in the waters underlying the same. The defendant in the action is engaged in pumping water from land, which pumping operations plaintiffs seek to enjoin, and it is claimed that said pumping will deplete the subterranean waters under said lot in the same manner as it will deplete the subterranean waters under the plaintiffs' land and which the plaintiffs by said action are attempting to preserve undiminished. If this claim is well founded, a judgment enjoining such pumping operations would protect the rights in said subterranean waters pertaining to said lot as fully as it would protect the rights of plaintiffs in the action, and under our decisions its claim that the judge is "interested" within the meaning of section 170 aforesaid would be well founded. (*North Bloomfield etc. Co.* v. *Keyser,* 58 Cal. 315.) The question whether or not the judge is so interested in that action must be determined by a consideration, of the allegations of the complaint in the action. It will be necessary to set forth at some length the facts alleged.

The Kaweah River has its sources in the west slope of the Sierra Nevada Mountains in the eastern part of the county of Tulare. It flows down the mountain slopes and reaches the plains at a point known as McKay Point, where it divides into several channels extending westerly from McKay Point for many miles, forming a fan-shaped comparatively level area containing many thousands of acres, which for brevity we designate as the Kaweah delta. With respect to this Kaweah delta, the complaint contains the following allegation:

"That upon said tract of land extending from said McKay Point, as hereinbefore alleged the said upper Kaweah

River Channel has from time immemorial deposited and distributed, and does now, by means of said channels and subterranean flow, deposit and distribute its waters thereon, in consequence of which vegetation has sprung up, agricultural products have been produced in large quantities, and upon which tract are located the cities of Visalia and Tulare, and other towns, and many hundreds of farms upon which are growing fruit trees, timber, alfalfa, and other agricultural crops, and upon which there are many thousands of people, and large numbers of live stock; that all of said farms and lands have required and do now require the whole of the waters of said Kaweah River, both surface and subterranean flow, for the irrigation thereof, and for moistening and keeping the same supplied with moisture from the underground flow thereof, and for watering live stock thereon, and for domestic and other beneficial uses of the persons residing thereon; that even during very wet or flood seasons, which occur but seldom, all of said surface and underground flow is needed and required for said tract of land, for the purposes above alleged.''

Also the following: ''That at all times during the irrigation of lands in said tract or during times of growing crops or grasses thereon, or in the use thereof, the underground flow from said Kaweah River is necessary to furnish a foundation for the surface waters flowing in said channels and to keep up the supply thereof, *and to hold up the underground water table beneath the surface of said lands*, in order to make the same productive; *that any lowering of said water table or underground flow* during such time will greatly diminish the productive qualities of said land and also diminish the amount of surface water carried, during said time, in said channels.'' (Italics ours.)

The land lying on the northerly and southerly sides of said Kaweah delta tract is slightly higher and is composed of more impervious material than that in said delta, so that the surface and underground flow of said Kaweah River is confined to said Kaweah delta tract. The waters of said river penetrate into and completely fill the lands of said Kaweah delta tract down to bedrock the whole width of said tract. In some places and at some times these waters appear as surface streams, but whether high enough to form such streams or not, they move down always as an under-

ground supply slowly southwesterly toward the westerly portion of said tract.

The several plaintiffs respectively own various tracts of land situated in said delta and divers ditches and water rights pertaining to their lands, and rights to take water from the said streams, and they use the waters of the branches of said Kaweah River as aforesaid to irrigate lands within said delta and for domestic use thereon. Some of these water rights are rights by appropriation only and others are rights pertaining to the land as riparian to one or the other of said streams. Certain of said plaintiffs owning land riparian to some one of the said streams have for many years past maintained upon their respective tracts of land wells and pumping plants by means of which each of them has at all times pumped and used water from said underground supply aforesaid for irrigation, domestic, and other purposes. The lands of said plaintiffs so pumping water require the underflow of said Kaweah River underneath said land for irrigation and domestic use thereof, and the whole thereof is necessary to pass by and through said lands for said purposes. The whole of the said underground flow is necessary to support and to supply the surface streams from which the plaintiffs divert water for irrigation and other uses. All of the lands of the plaintiffs are situated within said Kaweah delta and below the point therein wherein said defendant's pumping plant now to be mentioned is situated.

The Lindsay-Strathmore Irrigation District is a public corporation organized under the act of 1897 and amendments thereto. (Stats. 1897, p. 254.) The area of the land embraced in said district is about fourteen thousand acres. It is situated about twelve miles southerly of McKay Point and the lands within its limits are higher in elevation than those of the Kaweah delta. It was organized to obtain water and furnish the same to the lands within its limits for the irrigation thereof. Said Lindsay-Strathmore Irrigation District has not a sufficient water supply to irrigate the lands thereof. In order to obtain an additional supply it has purchased some eight or nine hundred acres of land lying along said Kaweah River and within said Kaweah delta and overlying the said underground body of water supplied by said Kaweah River, which constitutes a common

underground supply for all the land included in said Kaweah delta, and has bored wells in said tract of land to a depth of about one hundred feet into said underground body of water and it is now pumping and threatens to continue pumping from said wells water taken from said underground supply and transport the same to the lands within the said Lindsay-Strathmore Irrigation District and there distribute the same for the irrigation thereof. It is alleged that if said defendant is permitted to continue said pumping operations, "the water so taken and diverted by said defendant will substantially diminish the quantity of water in said underground body of water available to the lands of said plaintiffs as riparian owners, pumpers and the stockholders of said ditch company, plaintiffs herein, and the lands of each of said plaintiffs and of the stockholders in said company will thereby be rendered less productive and will be diminished in value, and the early and late supply of water to which each of said plaintiffs is entitled as hereinbefore alleged will be greatly diminished."

It appears from the foregoing, in connection with other allegations of the complaint, that all the waters used by the plaintiffs are derived wholly from the surface streams of the Kaweah River and its branches and from the underground waters of said Kaweah delta tract, and that the lands within said Lindsay-Strathmore Irrigation District to which it proposes to conduct the waters obtained from its pumping plant are "entirely outside of said watershed [of the Kaweah River] and outside of, and not a part of, any land or lands included in said" Kaweah delta tract.

The complaint concludes with the following allegations: "That all of the parties owning lands or diverting water in said tract extending westerly and southwesterly from said McKay Point are united in interest with said plaintiff, in the use of said underground water, but they are so numerous that it is impracticable to bring them all before this court, and therefore said plaintiffs bring this suit in behalf of themselves and also for the benefit of all of said parties."

The relief prayed for is a judgment declaring that the defendant has no right as against the plaintiffs or any of them to take or divert any of the underground waters underlying the said tract or land purchased by the defendant away from said lands or to the lands within the said

defendant irrigation district, and that said defendant be permanently enjoined from so doing.

It clearly appears from this statement of facts averred in the complaint that the lot of Judge Wallace, being in the city of Visalia, is within the limits of said tract known as the Kaweah delta. It is alleged that the waters of Kaweah River penetrate into and completely fill the lands of said Kaweah delta tract throughout its width down to bedrock, that they move down always as an underground supply southwesterly toward the lower points thereof, and that this underground flow is necessary to hold up the water-table in the soil, in order to make the same productive, and is needed for the irrigation of the lands therein and for domestic and other uses of the persons residing thereon. These allegations apply to the entire Kaweah delta tract. It necessarily follows that the flow of said underground water extends to and under said lot of Judge Wallace and is available for use thereon. If such flow is beneficial to all lands within the delta, as is alleged, it must be beneficial to said lot in the same way, although the amount of the benefit may be very small, as compared to that which may inure to the larger bodies of land specifically described in the complaint as belonging to the respective plaintiffs who are land owners.

It does not appear that Judge Wallace directly uses on said lot any part of said underground flow; indeed, it is conceded that he does not. He obtains water on his lot for domestic use and for watering plants and trees from the Visalia City Water Company. This company obtains its water from wells situated within said city, from eighty-five to one hundred feet deep, derived from the same supply as that in which the plaintiffs claim to be interested and which they seek to protect. As a resident of the city he has a right to receive water from that company upon payment of established water rates. It may be that this conditional and secondary right to the water is not sufficient to constitute an interest in the subject of the action, but we need not determine the question. The water underlies his lot and is, while there, a component part of his land. Following natural laws, as it must, when one particle of the water flows out from under that lot, another particle immediately replaces it. This movement insures a permanent supply of

water in his soil of which he may avail himself for the benefit of said lot and for any use he sees fit to devote it to thereon. The complaint in the main action proceeds on the theory that each owner of land within the Kaweah delta, which includes Judge Wallace's land, possesses this right as a part of his land, and that consequently each of them has an interest in the continuance of said underflow.

Respondents insist that the proposition that Judge Wallace is interested in the action because he owns said lot is founded on a misconstruction of the complaint and a misapprehension of the object of the action. They say that the only underground water in which the plaintiffs are interested is that from which some of them pump water on their own lands and that which underlies the Kaweah River and its branches at and in the vicinity of the places of diversion of the respective ditches from which the other plaintiffs are supplied with water; that in order to state a good cause of action for the relief asked by the plaintiffs it was only necessary to state that the underflow would be substantially diminished at those places by the threatened pumping operations of the defendant, that its effect elsewhere is immaterial, and that all the averments in the complaint as to such effect are surplusage; that, therefore, the allegations of the complaint to the effect that the waters of the Kaweah River penetrate and fill the soil of the entire Kaweah delta tract down to bedrock, including lands not belonging to any of the plaintiffs, that said underground water is always moving westerly and moistens and makes productive the soil of such lands of other parties, and that all such lands require the continuance of said underflow for that purpose and for domestic use, are all unnecessary to the cause of action sued on and must be disregarded in construing the complaint. If this be done, so the argument runs, there is nothing properly alleged in the complaint from which the conclusion would follow that Judge Wallace, by reason of his ownership of said lot, can be in any manner interested.

[1] There are at least two reasons which completely dispose of this argument. First. These averments now claimed to be superfluous show that there are many other land owners who, with respect to this underflow, are in the same situation as the plaintiffs and who will, in like manner, be injured by the pumping operations of the defendant.

Other allegations show that these persons are very numerous, amounting to "many thousands of people," and the last paragraph which we have above quoted states, in apt language, that these persons are united in interest with the plaintiff but are too numerous to make it practicable to bring them before the court and that, therefore, this suit is brought by the plaintiffs for the benefit of all of said parties. These are proper allegations to show that the suit is begun for the benefit of all who are interested therein, and for that purpose the above allegations, which are now claimed to be surplusage, are necessary to show the interest of the other persons. The cause of action is not for plaintiffs, alone, but for all other persons within the delta who have a like interest with the plaintiffs. (Code Civ. Proc., sec. 382.) **[2]** Second. Even if these allegations had been omitted, it would be competent for the petitioner herein to show the disqualification of the judge by allegations of the facts disclosed in the complaint, and said to be surplusage, coupled with the statement of his ownership in the aforesaid lot, and, upon that showing, to claim the disqualification. The disqualification of the judge, by reason of his interest, need not be shown upon the face of the complaint. It seldom does so appear. He will be held to be disqualified by this cause if the facts stated in the complaint, taken in connection with the extrinsic facts shown in support of the application for prohibition or for change of judge, make his interest appear. For example, in *North Bloomfield etc. Co.* v. *Keyser,* 58 Cal. 315, the action was by the city of Marysville to enjoin the North Bloomfield and other mining companies from depositing tailings from their mines in the channel of the Yuba River, and it was alleged that such deposit would fill up said channel and cause the waters to overflow the lands of the said city and deposit such tailings thereon. There was nothing in the complaint to indicate that the judge was in any way interested in the subject matter of the action, or in the relief awarded therein. But upon the application for change of venue, and also in the proceeding for prohibition against the judge, it was shown that he owned two small lots bordering upon and extending to the center of Feather River in the near-by town of Yuba City, that the tailings so brought down in the Yuba River from said mines would also be carried to,

be deposited in, and would fill up the channel of the Feather River opposite to and on said lots, and would endanger and injure said lots in like manner as it would injure the lands of the plaintiff sought to be protected by the injunction. The case is exactly parallel with the present case. The court said: "If the relief prayed for is awarded, the same judgment that stops the flow of tailings or debris on to the lands of the city of Marysville stops its flow on to the lands of the respondent. The very judgment that will protect Marysville will protect him. His interest, therefore, is not merely in the questions of law involved in the controversy, nor is it uncertain or remote; but it is a direct and immediate interest in the result of the action." He was thereupon held to be disqualified. The case of *Meyer* v. *San Diego,* 121 Cal. 102, [66 Am. St. Rep. 22, 41 L. R. A. 762, 53 Pac. 434], was an appeal from an order refusing to change the place of trial. The complaint did not show any interest on the part of the judge. The object of the action was to declare a contract between the city and a certain water company illegal and void and to enjoin the issuance and sale of the bonds necessary to carry out the contract. The statute authorizing the bond issue required an annual levy of taxes for forty years thereafter, upon all property within the city, to pay the principal and interest of the bonds. Upon the hearing of the application to change the venue it was shown that he owned real property situated and taxed in said city for municipal purposes which would be subject to such annual taxes for the payment of said bonds during the time they would run. This was held to show that he was interested and he was adjudged to be disqualified. For these reasons we are of the opinion that the petitioner has not misconstrued the complaint or misunderstood the object of the action.

[3] Judge Wallace has not hitherto used the underflow available in his lot, and it is not shown that he has any intention to do so. The argument that this removes the disqualification is contrary to the theory of the complaint, as above set forth, and contrary to the theory upon which the plaintiffs assume therein to be representing all the owners of land within the Kaweah delta. The complaint, in effect, alleges that they each have the right, at any time, to use the underflow beneath their respective lots, although they have

not previously done so and may not presently intend to do so. It does not help the argument if we should admit that this theory is erroneous in law, for to the judge is committed the duty of determining the law, as well as the facts, and he may determine it according to his interest as well as contrary to it. [4] The disqualification extends to an interest in a question of law as well as to an interest in a question of fact if it affects or determines the interest of the judge in the property involved. [5] Furthermore, all the persons thus represented are regarded as *quasi* parties and "may intervene and make themselves actual parties when necessary for the protection of their interests." (15 Ency. of Pl. & Pr. 634, 642.) And they are bound by the decree. (Ibid. 635.) The complaint, in effect, made Judge Wallace a potential party to the action.

[6] The respondents claim that, inasmuch as the lot of Judge Wallace can suffer but a very slight injury from the diversion in question, he would not be allowed to maintain an action for injunction to restrain such diversion or to intervene in such action, and, therefore, that he is not a party interested in this action. In support of this proposition they cite *Newport* v. *Temescal W. Co.,* 149 Cal. 531, [6 L. R. A. (N. S.) 1098, 87 Pac. 372], and *Cohen* v. *La Canada etc. Co.,* 151 Cal. 681, [11 L. R. A. (N. S.) 152, 91 Pac. 584]. The Cohen case merely holds that one who has no interest in water diverted from land adjoining his own, and who is not injured by the diversion, cannot enjoin such diversion. The Newport case states the familiar rule that where a public service company has appropriated to the public use property belonging to a third person and has begun the service, without first compensating him for its value, he cannot enjoin the public service if he can be adequately compensated in damages; and the other well-known rule that when the injury to the plaintiff is slight, as compared to that which will be suffered by the defendant if the injunction is granted, a court of equity may, in its discretion, deny the injunction. This argument does not answer the objection that the judge is interested in the action. The judge may be disqualified by reason of his interest in the subject matter where, because of the form of the particular action or the kind of relief asked, he would be unable to become a party to such action if he so desired.

It is sufficient if the result of the action will directly affect him in his property interests. **[7]** It is proper to say here, though not necessary to the discussion, that under the established rule in this state an injunction will lie to prevent a wrongful act if the continuance of such acts will, in time, ripen into an easement in favor of the defendant which will operate to deprive the plaintiff of the use of his property, or some part thereof, or where it takes from him the substance of his estate, although the immediate damage inflicted by the act is inappreciable. (*Moore* v. *Clear Lake Water Wks.*, 68 Cal. 150, [8 Pac. 816]; *Stanford* v. *Felt*, 71 Cal. 250, [16 Pac. 900]; *Heilbron* v. *Canal Co.*, 75 Cal. 431, [7 Am. St. Rep. 183, 17 Pac. 535]; *Learned* v. *Castle*, 78 Cal. 461; [18 Pac. 872, 21 Pac. 11]; *Vestal* v. *Young*, 147 Cal. 718, [82 Pac. 381].)

One of the principal points urged by the respondent is that the possible injury to the lot of Judge Wallace from the effect of the threatened diversion in lowering the underflow in said lot is so entirely unsubstantial and inappreciable that it comes within the operation of the maxim stated in section 3533 of the Civil Code: "The law disregards trifles," or, as expressed in the familiar Latin phrase, *"de minimis non curat lex."*

From the admissions and facts shown at the hearing it appears that the pumping plant of the defendants is in the Kaweah delta on the Kaweah River and is situated about twelve miles easterly of the said lot; that the said delta tract slopes gently from the site of said plant to and beyond the city of Visalia. Affidavits were filed on behalf of the respondents to the effect that while the pumping proposed to be done by the defendant 'will, in time, lower the plane of the water-table under the lands of the plaintiffs and those who are receiving the water distributed by the corporation plaintiffs and will greatly reduce the crops that may be grown on said lands, it would not "in any way affect the value or productive qualities of said lot of Judge Wallace, because it is not used for any such purpose as are the lands of said plaintiffs . . . or for the production of crops of any kind, or anything which requires the use of said, or any, underground water," and that, consequently, even if the waters underlying said lot should be diminished

or lowered by such pumping, the productive qualities and value of the lot would not be affected.

It is conceded by the petitioner that its proposed pumping operations threaten no immediate injury to said lot and that the lowering of the water plane in said lot, so far as may now be seen, will never be very great, and it is also freely admitted that the well-known high character of Judge Wallace for probity and fairness would preclude all who know him, or who know his well-earned character, from entertaining the suspicion that he would be influenced by such an interest, or that he would consent to sit in a case as to the result of which he knowingly had an interest or in which he was conscious of any bias whatever. But this, they assert, does not determine the case, inasmuch as even with the showing made by the respondents, the lot of Judge Wallace will be, to some slight degree, directly affected by the pumping threatened by the defendants and its potential qualities will be either protected or endangered to some extent by the result of the judgment, which, they contend, is sufficient to disqualify him.

It cannot be said that, as matter of law, the possible injury that may accrue to said lot from the pumping operations of the defendant will be inappreciable. The appearance of thousands of windmills throughout the state, both in the country and in the smaller cities, with the accompanying water-tank, demonstrate the fact that wherever there is an underground supply of water it is customary to obtain water therefrom by means of wells and pumps. It is a well-known fact that a very large part of the extensive region cultivated to citrus fruits in the part of the state in which this controversy arose has been irrigated with water obtained in this manner from the ground beneath the orchards. The owner of this lot could readily become independent of the Visalia City Water Company and supply himself with the same quality of water by putting down a well to the underflow and installing a pump to be moved by wind, electricity, or gasoline. And if, as suggested by the respondents, the lot is so near to the business section of Visalia that it is likely to be soon devoted to business uses, so that water for grass and plants will become unnecessary, the underflow will still be a material element of its possible value. It is not uncommon for the owner of a business

block over such underflow to erect a tank on the roof, sink a well, install a pump and keep the tank filled with water by that means, as a protection against fire and for ordinary uses within the building. Such possibilities add materially to the value of such property, as well as to residence or farm property. The defendant, in its answer to the complaint, avers that it intends to take out of said water supply a constant flow of seventy-five cubic feet of water per second. They also allege that the total annual run-off from the entire watershed which collects and supplies the streams and underflow in question amounts to three hundred and forty thousand acre-feet, of which the plaintiffs and other users of water in said delta use for irrigation, and other purposes, two hundred and twenty-five thousand acre-feet, and that of the remaining one hundred and twenty-five thousand acre-feet the defendant proposes to take thirty thousand acre-feet. The depth of the water-bearing stratum in which the underflow lies is not made to appear. But these figures show that the defendant proposes to take out and away from said delta region approximately one-tenth of the entire water supply coming into it from the only sources available—the rainfall and snows of the watershed. If proper allowance is made for run-off, wastage, and for evaporation and other losses, it will far exceed one-tenth. And it is not unreasonable to suppose that this estimate of the natural supply is not minimized by defendant to its own disadvantage and that it may be much more than one-tenth. That the extraction of this quantity of water from the underflow will lower its level materially throughout its extent must be obvious. Plaintiffs allege that it will have that effect. Such lowering would, of course, increase the expense of obtaining water on said lot by pumping and it is altogether probable that the increased cost would amount to an annual sum that would be very appreciable. At all events the court cannot say that it would not be so, and, unless this can be said with certainty, it cannot declare that the injury threatened is too slight to be measured or to be the subject of judicial cognizance, even if that would answer the objection.

[8] Furthermore, the well-established rule is that if the judge has an interest in the subject matter of the action, or has property which may be directly affected by the result of the judgment that may be rendered therein, the court will

not consider the extent of the interest nor inquire into the effect it would have upon his rulings. It is sufficient to disqualify him if it is a certain, definable, pecuniary, or proprietary interest or relation which will be directly affected by the judgment that may be rendered. (*Adams* v. *Minor,* 121 Cal. 373, [53 Pac. 815]; *Meyer* v. *San Diego,* 121 Cal. 105, [66 Am. St. Rep. 22, 41 L. R. A. 762, 53 Pac. 434]; *North Bloomfield etc. Co.* v. *Keyser,* 58 Cal. 315; *Heilbron* v. *Campbell,* 3 Cal. Unrep. 204, [23 Pac. 122].) In *Adams* v. *Minor,* the court said: ''We cannot take into consideration the amount of the judge's interest in the bank—indeed, it is not given; nor can we say that, of the entire issue of bonds, the part held by the bank was too small for judicial cognizance. It certainly was not so small as to come within the maxim '*de minimis non curat lex.*' Parker, C. J., in *Pearce* v. *Atwood,* 13 Mass. 324, said: 'No man can lawfully sit as judge in a cause in which he may have a pecuniary interest. Nor does it make any difference, that the interest appears to be trifling; for the minds of men are so differently affected by the same degrees of interest that it has been found impossible to draw a satisfactory line.' '' In *North Bloomfield etc. Co.* v. *Keyser, supra,* the court said that this section of the code should receive a broad and liberal construction and that ''the immediate rights of litigants are not the only objects of the rule. A sound public policy, which is interested in preserving every tribunal appointed by law from discredit, imperiously demands its observance.'' (Page 322.) In *Meyer* v. *City of San Diego,* the court quoted, with approval, the language of Lord Mansfield in *Hesketh* v. *Braddock,* 3 Burr. 1856, as follows: ''There is no principle in the law more settled than this, that any degree, even the smallest degree, of interest in the question depending, is a decisive objection to a witness, and much more so to a juror or to the officer by whom the juror is returned. If, therefore, the sheriff, a juror, or a witness be in any sort interested in the matter to be tried, the law considers him as under an influence which may warp his integrity or pervert his judgment, and therefore will not trust him. The minuteness of the interest won't relax the objection, for the degrees cannot be measured. No line can be drawn but that of a total exclusion of all degrees whatsoever.'' And the court added that ''while in terms this

case does not include the judge as coming within the principle of disqualification, it is not to be doubted that it applies with equal strength, and with more reason, to such 'an officer.'' The question must be considered as settled in this state. Our decisions on the subject are in harmony with those of other jurisdictions in which there are similar statutes. (17 Am. & Eng. Ency. of Law, 740; 23 Cyc. 577.)

Finally, it is contended that the defendant in the action, by its conduct, has waived the objection on account of the disqualification of the judge and that it is now estopped to raise it in this manner, or otherwise than by a motion for a new trial or by appeal.

In support of this contention it has been shown that the judge has owned and resided on the said lot for the last thirty-four years; that the deed conveying said lot to him was duly recorded in the office of the county recorder in the year 1887; that the trial of the action was begun on October 25, 1917, and was not concluded until May 15, 1919; that the taking of testimony therein occupied 164 days, and that on July 9, 1919, said judge announced his decision in favor of the plaintiffs; that during the entire proceedings no objection or suggestion was made to the court by any of the parties that the judge was disqualified to act by reason of his interest; that two of the petitioner's attorneys have resided in Visalia for more than twenty-five years, during all of which time they knew that the said judge resided and had his home on the said lot; and that no objection to the qualification of said judge to sit and act in the trial of said action was made until after the announcement by said judge of his decision in favor of the plaintiffs as aforesaid. It is apparent, also, that the trial has been very expensive. If an estoppel can arise upon facts of this character to prevent a party from applying for a writ of prohibition, the facts in this case would, we think, be sufficient for that purpose.

[9] The provisions of section 170 clearly imply that no such estoppel can be created, at least prior to final judgment, in an action to which the judge is a party or in which he is interested. Subdivision 1 of the section refers exclusively to such action, and the provision that the judge shall not ''sit or act'' in such case is absolute and unqualified. Subdivision 2 relates to disqualifications by relationship, and it expressly provides that such disqualification may be

waived by the parties by a stipulation in writing to that effect, signed by them and filed in the action. If the legislature had intended that a waiver or estoppel could be created by consent, acquiescence or failure to object to the trial by an interested judge, under the circumstances above stated, it is not reasonably conceivable that it would have left subdivision 1 positive and unqualified on that point, while, at the same time, expressly providing for a waiver where the disqualification arises from relationship. Also, it is plain that if it be the law that such conduct of itself operates as a waiver to prevent the party from raising the objection during the course of the proceedings, then there was no necessity or reason for providing expressly for a waiver before judgment in the latter subdivision. The insertion thereof in subdivision 2 shows that it was the legislative intent that no waiver or estoppel by conduct could arise prior to judgment under subdivision 1. This conclusion is emphasized by the fact that, although the same provision has been in force in this state ever since the year 1851, no qualification of this kind has ever been inserted in the frequent re-enactments thereof. The history of the law and the decisions thereunder confirm this theory.

Section 111 of the act of March 16, 1851 (Stats. 1851, p. 27), provided that a judge should not "act as such" in an action or proceeding in which he is interested. This provision has been continued in force from that time until the present. It has received interpretation in many cases. In *People* v. *De la Guerra*, 24 Cal. 77, the court said: "Even if no objection is made, he has no right to act, and ought, of his own motion, to decline to sit as judge. . . . The dismissal of the proceeding was void on the ground of the incompetency of the judge to act." In *Estate of White*, 37 Cal. 190, the court said that it was no answer to the disqualification arising from interest in the proceedings to say that the decision in the cause was correct and that "the statute does not say that the judge is disqualified to decide erroneously, but that he shall not decide at all." After these decisions the provision was re-enacted and made a part of the code as section 170. In *Tracy* v. *Colby*, 55 Cal. 67, it was held that a judge could not make a valid order confirming the sale of real property of a decedent if he was interested in the purchase thereof, and that extrinsic evi-

dence was admissible to show such interest.   In *Johnson* v. *German etc. Co.*, 150 Cal. 336, [88 Pac. 985], speaking of an order made by a judge who was disqualified by relationship, as to which the statute is in the same language, it was held that an order extending time to serve a proposed bill of exceptions was a judicial act, that it was wholly void, and that "any act of the disqualified judge in violation of the provisions of the statute, is absolutely void wherever brought in question."   Similar expressions are contained in the other California cases hereinbefore cited and also in *Livermore* v. *Brundage*, 64 Cal. 299, [30 Pac. 848].   Where the highest court of a state has construed a statutory provision, declaring it to have a particular meaning and effect, and the legislature afterward re-enacts it without change, "we are bound to suppose" that it was left unchanged "with the intention that it should be construed now as it was construed before." (*Estate of Li Po Tai*, 108 Cal. 487, [41 Pac. 486]; *Staude* v. *Board of Election Commrs.*, 61 Cal. 313, 323; *People* v. *Webb*, 38 Cal. 477; *People* v. *Coleman*, 4 Cal. 50, [60 Am. Dec. 581]; *Taylor* v. *Palmer*, 31 Cal. 254.)   The provision now contained in section 170 of the code, forbidding a judge to act in a cause in which he is interested, was first enacted in 1851.   Thereafter its meaning and effect was settled by the decisions above mentioned.   It has been re-enacted seven times without change, the last re-enactment being in 1915.   **[10]**  It must be supposed that the legislature intended it to have the meaning and effect that had been given to it by the previous decisions of this court.

**[11]**  It is also the uniform rule, under these statutes, that where such disqualification exists, consent of the parties cannot impart validity to the proceedings and that a party to the action who desires to attack them is not estopped from doing so by the fact that he attended during the trial without raising the objection.   (*Adams* v. *Minor*, 121 Cal. 375, [53 Pac. 815]; *Oakley* v. *Aspinwall*, 3 N. Y. 547; *Converse* v. *McArthur*, 17 Barb. (N. Y.) 413; *Matter of Hancock*, 91 N. Y. 284; *Chambers* v. *Hodges*, 23 Tex. 104; *Clayton* v. *Per Dun*, 13 Johns. (N. Y.) 218; *Schoonmaker* v. *Clearwater*, 41 Barb. (N. Y.) 218; *Richardson* v. *Welcome*, 60 Mass. 332; *Sigourney* v. *Sibley*, 38 Mass. 106, [32 Am. Dec. 248]; *Peninsular etc. Co.* v. *Howard*, 20 Mich.

26.) The reasons for this rule are so well stated in *Oakley* v. *Aspinwall* that we adopt its language:

"But where no jurisdiction exists by law it cannot be conferred by consent—especially against the prohibitions of a law, which was not designed merely for the protection of the party to a suit, but for the general interests of justice. It is the design of the law to maintain the purity and impartiality of the courts, and to insure for their decisions the respect and confidence of the community. Their judgments become precedents which control the determination of subsequent cases; and it is important, in that respect, that their decisions should be free from all bias. After securing wisdom and impartiality in their judgments, it is of great importance that the courts should be free from reproach or the suspicion of unfairness. The party may be interested only that his particular suit should be justly determined; but the state, the community is concerned not only for that, but that the judiciary shall enjoy an elevated rank in the estimation of mankind.

"The party who desired it might be permitted to take the hazard of a biased decision, if he alone were to suffer for his folly—but the state cannot endure the scandal and reproach which would be visited upon its judiciary in consequence. Although the party consent, he will invariably murmur if he do not gain his cause; and the very man who induced the judge to act, when he should have forborne, will be the first to arraign his decision as biased and unjust. If we needed an illustration of this, the attitude which the counsel for the moving party in this case assumed toward the court, the strain of argument which he addressed to it, and the impression which it was calculated to make upon an audience, are enough to show, that whatever a party may consent to do, the state cannot afford to yield up its judiciary to such attack and criticism as will inevitably follow upon their decisions made in disregard of the prohibitions of the law under consideration."

The petitioner has called our attention to the question of the disqualification of Judge Wallace under subdivision 5, added to section 170 in 1915. We are satisfied that the case comes within the spirit and scope of its provisions. It declares that in an action or proceeding "by or against the reclamation board of the state of California, or any reclama-

tion, levee, swamp-land or drainage district, or *any public agency,* or trustee, officer or employee thereof, affecting or relating to any real property or any easement or right of way, levee, embankment, canal, or *any work provided for or approved by the reclamation board of the state of California,* the judge of the superior court of the county, . . . in which such real property, or any part thereof, or such easement or right of way, levee, embankment, canal or work, or any part thereof, is situated, shall be disqualified to sit or act, and such action, if brought in the superior court, shall be heard and tried by some other judge of the superior court requested to sit therein by the governor." It further provides that the parties may, by stipulation in writing, waive the disqualification and may by like stipulation select some other judge to try the cause.

This subdivision was considered by this court in *Sacramento etc. Drainage Dist.* v. *Rector,* 172 Cal. 385, [156 Pac. 506], and was there held valid. It was also there decided that the expression, "provided for or approved by the reclamation board of the state of California," following the word "work," was a limitation upon that word only, and that it did not qualify or refer to the descriptive words immediately preceding it.

One of the main objects of this statute evidently was to prevent a judge, even if he is not interested, from sitting or acting as such in a cause which is of general interest to the community in which he lives and concerning which there is likely to be developed an active local public opinion and strong feeling which might greatly embarrass him, or affect him, consciously or unconsciously, in his decision, particularly in cases where the other party to the action was an outside agency operating in a manner that would directly affect local affairs and property interests. **[12]** Irrigation districts are not specifically mentioned, but they come within the meaning of the phrase "or any public agency." They are public agencies of the same character as those particularly named, and they are organized for the same general purposes to accomplish similar objects. There is no essential difference in these respects between an irrigation district and a reclamation district or a swamp-land or drainage district. The latter are organized to reclaim land by draining off the surplus water. Irrigation districts are

organized to reclaim land by supplying water thereto. In the desert land regious the word "reclamation" is in common use to indicate the bringing of water on the land for the irrigation thereof. If we apply the *ejusdem generis* rule of interpretation as is proper in such cases, we must hold that the above phrase was intended to include irrigation districts, although it may not include public corporations in general.

The facts disclosed in the present case show that it comes within the purpose of the act. The Kaweah delta embraces a very large area of land inhabited by many people. The general use of water from the underflow and from the streams fed or supported thereby makes the region very productive. Judge Wallace has lived there for thirty-four years and has seen a large part of the country about him gradually change from a comparative desert to a fruitful garden. The petitioner is an outside public agency organized for the benefit of another community. It proposes to take water from the same source as that which has for years supplied the growing needs of the delta region. The conditions naturally tend to engender feelings of antagonism and to arouse local public opinion. A sound public policy would so provide that the local judge may be relieved from the embarrassment of having to try such a case. We are of the opinion that Judge Wallace is disqualified by reason of the provisions of this subdivision, as well as under the provision of the first subdivision of the section.

The conclusion is that the judicial acts and proceedings of Judge Wallace in said action must be deemed invalid, and that the action must proceed again from the beginning before some judge who is not disqualified.

In view of the extreme length of the trial and the expense incurred therein, it may be unfortunate that the result cannot stand without impeachment, except by appeal, and for reasons going to the merits. But the courts cannot change the statute on the subject. We can only suggest to the legislature that it may be possible to frame a provision for avoiding such a miscarriage and which will not contravene a sound public policy on the subject.

Let a writ issue commanding the superior court of the county of Tulare and Honorable W. B. Wallace, as judge thereof, to refrain from proceeding further in said cause,

except that if a qualified judge is called to act as judge thereof the court may proceed with a new trial of said action before such judge.

Lennon, J., Wilbur, J., Angellotti, C. J., and Lawlor, J., concurred.

OLNEY, J., Concurring.—I concur, but only on the ground that Judge Wallace is disqualified by subdivision 5, section 170, of the Code of Civil Procedure. That he had or has a disqualifying personal interest is not in my judgment the fact. It is not necessary, however, to discuss the point. Suffice it to say that I think it affirmatively appears that whatever right Judge Wallace, as the owner of the lot upon which he resides, may have to the continued maintenance of the water level of the subterranean waters beneath its surface is not merely of only slight value to him, but is of no value or concern to him at all. In other words, his right, if he has any, is purely theoretical and his so-called interest is not a thing of reality. (*Oakland* v. *Oakland Water Front Co.*, 118 Cal. 249, 252, [50 Pac. 268].) I can understand perfectly how it never occurred to Judge Wallace or to the litigants or counsel until a very recent date that his ownership of the lot gave him any personal interest in the litigation, though his ownership was well known, and the fact that it did not occur either to him or to them seems to me strong corroboration of the view that he has no interest in any real sense of the word.

The main opinion might possibly be thought to intimate that under our code section a judgment of a *court* rendered by a judge thereof disqualified because of interest or otherwise is void for want of jurisdiction. I am satisfied that this is not true. It is, however, not necessary to determine the point for the purposes of the present decision, and as I understand it no opinion is expressed upon it by the main opinion.

I also do not concur in the statement that under our statute a party may not estop himself from asserting the invalidity of proceedings theretofore taken before a disqualified judge. But in order that such estoppel exist, it should affirmatively appear either directly or by reasonable inference that the party attempting to assert the disquali-

fication knew previously both of the disqualification and of his right to insist upon it, and, nevertheless, made no objection, but permitted the proceedings to go on. This does not appear in the present case. But if it had, I think the petitioner would have been estopped. It would seem to me intolerable to permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.

Rehearing denied.

All the Justices concurred.