SULLIVAN, J.
Defendant was charged in an information with a violation of section 476a of the Penal Code (wilful drawing of check without sufficient funds with intent to defraud). The information alleged that he had previously been convicted of a violation of section 470 of the Penal Code (forgery) and in addition charged two prior felony convictions (burglary and robbery). Defendant pleaded not guilty and admitted the two prior convictions. He properly waived a trial by jury and after trial by the court was found guilty as charged and sentenced to imprisonment in the state prison. He appeals from the judgment of conviction.
On September 10, 1960, the defendant presented a $20 cheek at the check cashing booth of a Safeway store in Eureka, California. At the time, the manager of the store was working in the booth and the defendant spoke to him by name, although the latter testified he had never seen the defendant before. The manager cashed the cheek and gave the defendant $20.
The cheek was drawn on the Bank of America, Eureka Branch, dated September 10, 1960, made payable to cash and signed “Robert Leonard Pratt.” The defendant admitted on the stand that he wrote it. On its face were his address apparently written by him and his employer’s name which he denied *840 writing. Although the cheek showed that in the date “September 10” the zero had been written over a “2,” the manager testified that it was so written when handed to him and that the defendant had not made out the check in front of him. The check was presented by Safeway for payment and dishonored, since the defendant had no account at the above-mentioned bank.
The defendant testified that he wrote the check and cashed it over the holiday weekend of September 10. He maintained however that he had been drinking for several days and was intoxicated at the time. He claimed to have written other checks at about the same time and that afterward, when he realized what he had done, he made inquiries at certain places of business as to whether he had cashed checks there so that he could redeem them. On cross-examination, he admitted that he knew the check subject of the instant charge “wasn’t any good” but claimed he had had intentions of opening an account at the bank to make the check good. In response to questions by the court, he testified that he did not know whether he wrote the check on September 10 or September 12 or whether it was he who wrote the “zero” over the “2” in said date. As we have pointed out, his employer’s name was printed on the check; he denied it was his printing.
He further testified that on September 15 he left for Portland, Oregon, where, he said, he spent part of the time in an alcoholic clinic, returning to Eureka on January 28, 1961. On his return, the matter of the defendant’s checks came up for discussion with his parole officer. He again left Eureka to take a job in Crescent City. The defendant further testified that before he did so he asked his parole officer whether he should pay the outstanding cheeks but was told by the latter to wait until he commenced working in Crescent Cit3r.
While under cross-examination, the defendant also admitted that while in Crescent City he cashed three checks drawn on the United States National Bank of Portland without having sufficient funds at said bank, that as a result he was arrested in Crescent City and pleaded guilty to having so drawn such checks, and that when he was arrested on the instant charge, he had in his possession another check drawn on the last named bank which was signed “Robert Leonard” and which he attempted to dispose of in a wastepaper basket at the time.
Some of the defendant’s testimony was corroborated by other witnesses. On cross-examination, the manager of the Safeway store testified that he “smelled liquor” while the defendant’s cheek was being cashed but would not state posi *841 lively the odor came from the defendant. The manager of a Purity store in Eureka testified that on or about September 15 the defendant inquired at the store whether he had had a cheek cashed there. One Joan Givianini testified that the defendant had been drinking heavily at the time, that she had borrowed money to help him redeem any outstanding checks and had gone with him to the Purity store when he made the inquiry there. The defendant’s parole officer, called as a witness in defense, testified that he had first learned about the defendant’s checks from Mrs. Givianini in October and had talked to the defendant on the subject when the latter returned from Portland in January.
The defendant contends before us that: 1) Because the trial judge was blind and therefore unable to perceive the evidence, the court below lacked jurisdiction to hear and determine the case and its judgment of conviction being rendered without due process of law is void; 2) the evidence was insufficient to establish the requisite intent to defraud; and 3) we should reduce the degree of the offense or the punishment imposed or discharge the defendant from custody.
Defendant’s first contention is predicated upon subdivision 7 of section 170 of the Code of Civil Procedure which, in relevant part, provides: “No justice or judge shall sit or act as such in any action or proceeding: 7. When, as a judge of a court of record, by reason of permanent or temporary physical impairment, he is unable to properly perceive the evidence or properly conduct the proceedings.” Subdivision 7 was added to the section in 1957. (Stats. 1957, ch. 1545, § 1, p. 2905.)[1] Section 170 is applicable to criminal proceedings. (Blackman v. MacCoy (1959) 169 Cal.App.2d 873, 878 [338 P.2d 234, 339 P.2d 169].)
However, there is nothing in the record before us which shows or gives rise to a reasonable inference that the trial judge was “by reason of permanent or temporary physical impairment” including blindness “unable to properly perceive the evidence or properly conduct the proceedings” in the instant case. We have examined the record thoroughly and find that it contains no statement, remark, observation or intimation, by either the defendant or his counsel, pertinent to the judge's perception of the evidence or conduct of the pro *842 ceedings, much less any objection made before, during or after the trial by or on behalf of the defendant, who freely waived a trial by jury in the manner required by law (Cal. Const., art. I, § 7), that his case should not be heard and determined by the trial judge below. The record discloses no motion or proceeding of any kind to disqualify the trial judge. The defendant made no motion for new trial. His first contention therefore is, on this record, entirely devoid of merit and the issues presented thereby are, in our view, disposed of on such grounds.
Nevertheless we cannot remain insensitive to the fact that counsel for both parties have argued this issue in their briefs and at oral argument.[2] While appellant’s statement in his brief as set forth in the footnote is not part of the record on appeal (Gantner v. Gantner (1952) 39 Cal.2d 272, 278 [246 P.2d 923]), we are prompted to pursue the matter further, upon the assumption, arguendo, that the judge was blind.
As we have pointed out above, the defendant made no objection to being tried by the judge who presided in the instant case and presented no motion nor initiated any other proceeding to disqualify him. At all times represented by counsel, he freely consented to being tried by the judge without a jury. Obviously both the defendant and the public defender knew the judge was blind. No contention has ever been made, even by defendant’s present counsel who has raised this issue for the first time on appeal, that defendant did not know before the commencement of his trial of the judge’s impairment of vision. Defendant was of course well aware of the fact that he was charged with drawing the check above described and that his trial would involve a consideration of it by the trier of fact. Nevertheless he neither demanded a jury trial nor moved to disqualify the judge.
Section 170 of the Code of Civil Procedure provides that whenever a judge “who shall be disqualified under the provisions of this section” fails to declare his disqualification, any party to the action may file “a written statement objecting to the hearing of such matter or the trial of any issue of fact or law in such action or proceeding before such judge, and setting forth the fact or facts constituting the ground of the disqualification of such judge.
*843 . . The statement of a party objecting to the judge on the ground of his disqualification, shall be presented at the earliest practicable opportunity, after his appearance and discovery of the facts constituting the ground of the judge’s disqualification, and in any event before the commencement of the hearing of any issue of fact in the action or proceeding before such judge.” (Emphasis added.)[3] The statute also provides that the grounds of disqualification specified in subdivisions 2 (financial interest), 3 (relationship), 4 (former counsel) and 6 (actions against certain agencies relating to real property) may be waived if the parties “shall sign and file in the action ... a stipulation in writing, waiving the disqualification ...”
In Caminettiv. Pacific Mutual L. Ins. Co. (1943) 22 Cal.2d 386 [139 P.2d 930] it was held that although no written waiver had been signed and filed, any disqualification under subdivision 3 was waived by failure to object at the “ ‘ earliest practicable opportunity ’ ” and thus to comply with provisions of section 170 set forth by us above. Commenting upon the fact that no case rendered the 1927 amendment inapplicable to subdivision 3 the court said: “While the 1927 amendment does not specify in so many words a penalty for failure to urge disqualification at the ‘ earliest practicable opportunity, ’ the intention is clear that failure to comply with the provision constitutes a waiver. Any other construction would render the amendment ineffective. Appellants cite Emerson v. Superior Court, 7 Cal.2d 685 [62 P.2d 363], and other cases, to the effect that a waiver by conduct or equitable estoppel may not be urged as a substitute for a statutory requirement of a written stipulation. These cases are inapplicable, since the 1927 amendment affords an additional statutory means by which a disqualification arising under subdivision 3 of section 170 may be waived, viz., failure to urge such disqualification at the ‘earliest practicable opportunity.’
“. . . Appellants failed to challenge Judge Vickers’ qualification . . . until some three months after discovery of the fact underlying the disqualification and then only after Judge Vickers had ruled adversely to them in denying their motion to set aside the voting trust. The 1927 amendment was aimed at such dilatory tactics.” (22 Cal.2d at pp. 391-392; emphasis added.)
The reasoning of the Supreme Court in Caminetti has been *844 applied to establish a waiver of disqualifications assertable under other subdivisions of section 170. (Subd. 4 (former counsel) Mayo v. Beber (1960) 177 Cal.App.2d 544, 548-551 [2 Cal.Rptr. 405]; subd. 6 (certain actions against state agencies) Sacramento & San Joaquin Drainage Dist. v. Jarvis (1959) 51 Cal.2d 799, 800-802 [336 P.2d 530]; Rio Vista Gas Assn. v. State of California (1961) 188 Cal.App.2d 555, 564 [10 Cal.Rptr. 559].) In Sacramento & San Joaquin Drainage Dist. v. Jarvis, supra, the court said at page 802: “In the present ease it is obvious that the parties did not at the earliest practicable opportunity object to the judge’s disqualification. On the contrary, they waived his disqualification before the trial was commenced and, in fact, never objected thereto until the matter was called to their attention by the District Court of Appeal several years after the trial had taken place. [Footnote omitted.] ”
Where disqualification under subdivision 5 (bias or prejudice) has been claimed, it has been held that “The objection that a trial judge is disqualified from hearing issues of fact in a ease must be made before the commencement of a hearing of any issue of fact in the action.” (People v. Schoonderwood (1945) 72 Cal.App.2d 125, 126 [164 P.2d 69]; see also People v. Moller (1960) 177 Cal.App.2d 379, 382 [2 Cal.Rptr. 223]; People v. Wade (1957) 150 Cal.App.2d 281, 285 [309 P.2d 841].)
Although the parties have not cited, nor has our independent research disclosed, any eases applying the 1927 amendment referred to above to subdivision 7 here under consideration, we are persuaded that the reasoning of the above authorities is applicable to the problem at hand. We feel that the following language from the concurring opinion in Lindsay-Strathmore Irr. Dist. v. Superior Court (1920) 182 Cal. 315, 338 [187 P. 1056], to which the Supreme Court adverted in Caminetti, supra, is significantly pertinent here: “ ‘It would seem . . . intolerable to permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.’ ” (22 Cal.2d at p. 392.)[4]
*845 Defendant relies upon Cadenasso v. Bank of Italy (1932) 214 Cal. 562 [6 P.2d 944] and In re Cavitt (1941) 47 Cal.App.2d 698 [118 P.2d 846] for the proposition that a judge disqualified by section 170 has no jurisdiction to enter a judgment. He contends that any affirmance of the judgment herein requires that the above two cases be overruled or distinguished. Indeed the court in Gaminetti did hold that the Gadenasso case “is distinguishable because the disqualification there involved arose under subdivision 1 of the section and was not discovered until after trial of the action, whereupon the parties took steps to have the judgment vacated at the first opportunity. Thus, the effect of that part of the 1927 amendment here involved was there left undecided.” (22 Cal.2d at p. 391.) In re Cavitt did not involve disqualification of judges. Neither case assists defendant here.
The defendant’s guilt was conclusively established. He admitted that he wrote and presented the check. He admitted also that he knew it “wasn’t any good.” He knew he had no account at the bank in question. His claim that he intended to open one could be, and apparently was, rejected as a weak excuse, unworthy of belief. His claim that he was intoxicated at the time appeared to be his only defense. Despite his professed intentions of redeeming certain checks, his explanations are shaken if not shattered by his subsequent repetition of the same conduct. In our view, the check itself for which defendant was prosecuted presented no crucial factual problem. The matter of dating the check and the superimposition of one numeral on the other appears from the cross-examination of the Safeway store manager who testified that both marks were on the check when he received it. The suggestion to this witness that there was more than “one type of ink” on the cheek met with a flat denial; other than some vague statements by the defendant of his activities on what he claimed to be a lost weekend, no other evidence was offered to give the alleged two types of ink any probative significance.
At the end of the redirect examination of the defendant, he was extensively questioned by the court. All in all the record shows that he had a fair trial and a full opportunity to present his explanation of the incident which was the subject of the charge.[5]
We therefore conclude (assuming the judge was *846 blind) that under the particular facts of the case before us, by failing to object to any disqualification of the judge before the commencement of the trial, indeed by consenting to being tried by him without a jury, and by asserting a claim of disqualification only after an adverse judgment and then for the first time on appeal, the defendant lost his right to make any such objection and waived the disqualification asserted. The defendant had a full and fair trial and an opportunity with the assistance of counsel to prepare and present his defense. We therefore find nothing under these particular facts which denied him due process. Assuming the judge’s impairment of vision, we cannot conclude on this record that by reason thereof he was unable to properly perceive the evidence or properly conduct the proceedings. Our statements herein, however, must not be taken as a holding that in every instance and under any facts, failure to object to such a physical impairment as we here discuss will establish a permissible waiver and satisfy the requirement of due process.
Defendant also argues that he should not be held to have waived the judge’s disqualification because he “knew nothing of Code of Civil Procedure Section 170 ([subd.] 7),” he “had no way of knowing that the trial judge was legally incompetent to try the cause” and while “his attorney did” certain conditions prevented the attorney’s realistic assertion of an objection. By way of explanation, defendant contends that the public defender’s office handles a heavy volume of criminal work, that the judge who presided in the instant case handles the bulk of the criminal trials and that consequently it is unreasonable to expect that the public defender would object in every case to such judge’s alleged disqualification. Defendant complains that he is a victim of this state of affairs (“system”) and therefore should not be bound by the public defender’s failure to object. However he makes no claim that he ever made any objection to this “system” or urged the public defender to take steps to have the case tried by another judge or that he was brought to trial over his objections to either court or counsel or in any way without his consent. The above argument is answered by the simple fact that defendant was represented by counsel. Such counsel had the exclusive right to conduct the defense and control the *847 proceedings pertaining thereto. (People v. Merkouris (1956) 46 Cal.2d 540, 554 [297 P.2d 999].) Defendant was bound by the action of such counsel during the trial. (People v. Gibbs (1961) 188 Cal.App.2d 596, 603 [10 Cal.Rptr. 581].) If such counsel, apparently as well, as the defendant, personally consented to the trial judge below “Consent of counsel is, of course, consent of the party.” (People v. Bradford (1955) 130 Cal.App.2d 606, 607 [279 P.2d 561].)
We turn to the defendant’s second contention on appeal. It is urged that “the evidence . . . leaves a serious doubt that the defendant possessed the requisite intent to defraud”; that “the record is devoid of evidence indicating an intent to defraud”; and that “to support a conviction, evidence of appellant’s guilt, including intent to defraud, must be beyond a reasonable doubt and to a moral certainty.” Defendant appears to us to be confused about the rules defining the scope of our review. No elaborate citation of authority should be required to make clear that our inquiry here is directed to determining whether there is any substantial evidence contradicted or uncontradicted which will support the finding of guilt. (E.g., People v. Poindexter (1958) 51 Cal.2d 142, 148 [330 P.2d 763]; People v. Daugherty (1953) 40 Cal.2d 876, 885-886 [256 P.2d 911], cert, denied 346 U.S. 827 [74 S.Ct. 47, 98 L.Ed. 352], rehearing denied 346 U.S. 880 [74 S.Ct. 120, 98 L.Ed. 387]; People v. Foster (1961) 195 Cal.App.2d 651, 653 [15 Cal.Rptr. 891].)
It is clear from our summary of the testimony set forth above that there is ample evidence to support the defendant’s conviction. Indeed the presentation of the check, the receipt of money therefor, the absence of a bank account, and the knowledge on the part of the defendant that the check wasn’t any good, are all established by uneontroverted evidence. There is also evidence in the record of similar transactions involving bad checks written by the defendant to some of which he pleaded guilty in other proceedings and all of which were admissible to show his intent to defraud and a common plan or scheme. (People v. Spaise (1961) 193 Cal.App.2d 294, 298 [14 Cal.Rptr. 167]; People v. Bernstein (1948) 88 Cal.App.2d 522, 524-525 [199 P.2d 22].) The trial court was entitled to reject the defendant’s claim that the requisite intent to defraud was negated by a condition of extreme intoxication, and from the circumstances of the transaction was justified in inferring the existence of such an intent on the defendant’s part. (People v. Oster. (1954) 129 Cal.App.2d 688, 692 [278 *848 P.2d 39].) In his closing brief defendant sets forth a number of facts which he argues negates such intent. They merely raise a conflict in the evidence; defendant’s efforts are merely an attempt to have us reweigh the evidence and analyze the factual conflict. This is not our function. (Berniker v. Berniker (1947) 30 Cal.2d 439, 444 [182 P.2d 557].)
Since we conclude that the judgment should be affirmed, we find it unnecessary to consider defendant’s remaining contention on appeal.
The judgment is affirmed.
Bray, P. J., concurred.

Counsel for defendant, has furnished us with a synopsis of the legislative history of the amendment, from which it appears that the Senate Bill as originally proposed referred to "permanent or temporary impairment of vision, ’ ’

Appellant states “The Honorable Trial Judge was blind.” Respondent merely meets appellant’s argument without admitting, stating or implying that the judge was blind. On oral argument counsel for re spondent refused to so stipulate.

Part of language added by 1927 amendment (Stats. 1927, eh. 744, § 1, p. 1403). This language appears in certain paragraphs between subdivisions 5 and 6.

Tke above excerpt is also quoted in Sacramento & San Joaquin Drainage Dist. v. Jarvis, supra, 51 Cal.2d 799, 802, fn. 1; Mayo v. Beber, supra, 177 Cal.App.2d 544, 552; Woolley v. Superior Court (1937) 19 Cal.App.2d 611, 625 [66 P.2d 680].

The reporter’s transcript covers 51 pages. The prosecution called two witnesses, whose testimony covers 19 pages; the defense four witnesses covering 32 pages. Of the 32 pages of defense testimony, approximately *846 25 pages were of the defendant’s own testimony. Direet examination of the defendant covers 7 pages; cross-examination 7 pages; redirect examination 1 page. At the end of the redirect examination the court closely questioned the defendant at length. This covers 8 pages in the record.