68 P.(2d) 928

**GOLDEN v. GOLDEN.**

No. 4187.

Supreme Court of New Mexico.

April 24, 1937.

Rehearing Denied June 21, 1937.

358

R. A. Prentice and J. V. Gallegos, both of Tucumcari, and E. R. Wright and Donovan N. Hoover, both of Santa Fe, for appellant.

Myron B. Keator and C. H. Hittson, both of Tucumcari, and H. A. Kiker and Manuel A. Sanchez, both of Santa Fe, for appellee.

ZINN, Justice.

Margaret Golden, hereinafter referred to as appellee, sued Ernest M. Golden, the appellant, for divorce. He defended on two grounds. First, that a decree of divorce had been granted to him from Margaret by the civil district court of Brevos district, City of Juarez, state of Chihuahua, Mex., upon petition signed by both, and that such decree is a bar to the present suit and appellee is estopped from bringing the instant suit because the identical issue had been litigated in the Mexican court. Second, that the marriage between them was not a valid marriage having been solemnized by the probate judge of Curry county, N. Mex., which official appellant contends is not a civil magistrate within the meaning of Comp. St. 1929, § 87-102. Thus two issues of law are squarely presented for our determination. Two other minor issues are raised on appeal.

The trial court ruled in favor of appellee granting the divorce and awarding her a lump sum in settlement of her property rights and as alimony. This appeal is prosecuted by appellant.

Facts necessary to a clearer understanding of the issue will be recited from the record in this opinion as the questions are determined. The transcript and briefs are voluminous. Counsel for both parties by their research and brief have ably presented this case.

■ The first point assigned in the brief presents the question of the validity of a marriage solemnized by a probate judge.

The Organic Act establishing the Territory of New Mexico, approved September 30, 1850, fixed the judicial powers of the courts. Probate courts in the Territory, as now, were courts of special and limited jurisdiction. Appellant contends that such judges cannot solemnize marriages, being confined to the administration of personal estates, and other duties specifically assigned to such tribunal by the Legislature, and are not "civil magistrates" within the meaning of Comp. St. 1929 § 87-102.

It is conceded that the Legislature never expressly authorized judges of the probate courts of New Mexico to solemnize marriages. Neither do we find where judges or justices of any other court are expressly authorized by statute to solemnize marriages. To us is left a determination of who constitute "civil magistrates" within the meaning of section 87-102. This must be determined in the light of the meaning of the phrase "magistrado civil" or civil magistrate as found in the act of February 2, 1860, C. L. 1865, c. 75, § 1, now Comp. St. 1929, § 87-102. This section was originally section 2 of "An Act to Incorporate the Mesilla Mining Company" of the laws of the Territory of New Mexico passed by the Legislative Assembly, Session of 1859-1860, p. 120, approved Feb. 2, 1860. It would be very interesting to know how a section authorizing ministers and magistrates to solemnize marriages found its way into an act incorporating a mining company. At this late date we might only speculate. Nevertheless, it became the law and is the law to this date.

Probate courts during the year of 1850 when the Organic Act was approved, and for many years thereafter, had a far more extensive jurisdiction than at the present time. The statute books of the time and later show that such courts were vested not only with probate jurisdiction, but also with jurisdiction of other civil and criminal matters as well. Their jurisdiction would justify their denomination at that time as courts intermediate between the justice of the peace courts and the district courts. They were courts of record, having a clerk and seal. Certain causes tried in the courts of the justices of the peace were appealable to the probate courts. See "An Act to Regulate and conduct Causes in Appeal in all the Courts of this Territory," adopted January 30, 1862. Laws 1861-1862, p. 50. Throughout the entire period of time from the passage of the Organic Act and many years thereafter, laws

were enacted giving the probate court jurisdiction over matters beyond the limited scope of a court having strictly probate jurisdiction.

A very clear example of the more extensive jurisdiction of the probate courts is indicated by a law approved the very day section 87-102 was approved, which gave probate courts extensive jurisdiction in civil and criminal causes. This act so far as material reads as follows:

"Sec. 2. The probate courts shall have jurisdiction in civil suits upon open and liquidated accounts, replevin, debts of any nature, when the sum claimed does not exceed five hundred dollars. Said courts shall also have jurisdiction in all criminal cases which pertain to the jurisdiction of justices of the peace, having concurrent jurisdiction with them in such causes, and shall receive appeals according to and under the same restrictions as now provided by law relative to appeals, touching such crimes, taken from justices of the peace to said probate courts.

"Sec. 3. That the practice in the said courts of the judges of probate shall be the same as that in the district courts, in all its parts and provisions."

The remaining sections of the act relate to the drawing of the petit jurors, for service in the probate court, their compensation, the number of peremptory challenges available to each party, the time of holding terms in the various counties, and other matters not pertinent to the question under consideration. See Laws of 1859-60, p. 90.

It is clear to our minds that the phrase "presiding magistrate" found in section 905 of the Organic Act (Rev.St.U.S. § 905, 28 U.S.C.A. § 687) included probate judges. Counsel for appellant argue that probate judges are not the same as those magisterial officers who at the time of the military occupation of the Territory (after the Treaty of Guadalupe Hidalgo, [9 Stat. 922]) and before the adoption of the Organic Act were known as prefects. The Revised Statutes of 1850 (Kearney Code), c. 12, compiles all the various statutes theretofore enacted relating to courts and judicial powers. Article 3 of said chapter clearly indicates that the probate judges were the same as the prefects. It is too apparent to even admit of argument that the probate judge in 1860 was no other than the officer theretofore known as prefect. For example: In 1859-60 (and throughout that period), upon the creation of a new precinct, the Territorial Legislature imposed the duty upon the probate judge to order an election to be held in such newly created precinct to elect a justice of the peace and a constable for the newly created precinct. Habit, which is sometimes strong, permitted the use of the word prefect where probate judge was intended in one of the acts creating such a precinct. See "An Act creating an additional Precinct in Rio Arriba County." Laws of New Mexico, 1859-60, p. 24. Compare with "An Act creating Precinct of the Preciosa Sangre de Cristo, Number 10, of the County of

Valencia." Laws of New Mexico, 1859-60, p. 56. Also p. 82, and others. Clearly the prefect was the probate judge and the alcalde the justice of the peace.

From a reading of the various statutes in existence at that time, it clearly appears to us that a probate judge was a magistrate even in the narrower sense contended for by counsel for appellant.

We must, however, look to the meaning of the term "magistrate" as found in the statute itself. That is, who comprised the body of men known in 1860 as "civil magistrates."

"In its most enlarged signification, this term (Magistracy) includes all officers, legislative, executive, and judicial. *In a more confined sense, it signifies the body of officers whose duty it is to put the laws in force; as, judges, justices of the peace and the like.* In a still narrower sense, it is employed to designate the body of justices of the peace. It is also used for the office of a magistrate." (Italics ours.) 38 C.J. 332.

In Gordon v. Hobart, Fed. Cas. No. 5,609, 2 Summ. 401, Justice Story said: "I know of no other definition of the term 'magistrate' than that he is a person clothed with power as a public civil officer." Citing 1 Bl.Com. 146. This definition is quoted approvingly in Compton v. Alabama, 214 U.S. 1, 29 S.Ct. 605, 53 L.Ed. 885, 16 Ann.Cas. 1098.

Paraphrasing Justice Story, we know of no other definition of the term "magistrate" than that he is a person clothed with power as a public civil officer. The Territorial Legislature of 1859-60 clearly understood that probate judges were judges of courts of record, with a clerk and seal, and clothed with power as public civil officers. The members of the Legislative Assembly of 1859-60 were largely natives of the then Territory of New Mexico. They and their ancestors had lived in the Territory prior to the annexation of the same by the United States of America. This is evidenced by the fact that almost all of the laws and resolutions adopted at that session were in the Spanish language. To these legislators the prefect and the judge of the probate court were the same. A prefect was a "magistrate" designated as such in law. See Kearney Code, p. 85, under the heading "Practice of Law in Criminal Cases." When a change was made by law enlarging the group who could thereafter solemnize marriages and such act added "magistrado civil" to ordained clergymen as authorized to solemnize marriages, such civil magistrate clearly meant, not only justice of the peace, the judges of the district courts, but also included the judges of the probate courts. This has been the understanding of the law for more than eighty-five years. To hold otherwise would invalidate the marriages of many people who in good faith have had their marriages solemnized by judges of the probate courts of New Mexico, and would bastardize the children of such marriages.

We deemed it best to decide this point squarely rather than decide the issue upon the theory that the appellant is estopped

from questioning the validity of the marriage, having participated therein, as urged upon us by appellee. We hold that the marriage of Ernest and Margaret Golden, solemnized by the judge of the probate court of Curry County, was a valid marriage.

We come next to the claim of appellant that the decree of divorce granted to him from Margaret by the civil district court of Bravos district, city of Juarez, state of Chihuahua, Mex., is a valid decree, and therefore a bar to the present suit. Appellant also claims that the wife by her own words, writing, and conduct, having consented to the Mexican decree, is now estopped from attacking the validity of said decree. Appellant further contends that the validity of the Mexican decree cannot be attacked herein, but must be attacked directly in a suit to set the same aside.

A recital of a few of the facts is necessary. Ernest and Margaret left Tucumcari, N. Mex., about 8:45 p. m., drove all night to El Paso, Tex., arriving there about 10 or 11 the next morning. The car, containing accessories, was left on the El Paso side of the International bridge, and both parties walked across the bridge to Juarez, Mex. In Juarez they walked up and down the main street, and Ernest would emerge from the various shops several times and would remark to Margaret that "they was too high." Accompanying Ernest and Margaret was a "hitch-hiker" of the female variety that had accompanied the Goldens to El Paso from Tucumcari. While Ernest and the hitch-hiker took a glass of whisky, Ernest gave Margaret the key to the car and told her to get the marriage license. She walked back across the bridge to the car in El Paso and secured the license and returned to Juarez where she found Ernest accompanied by one Rodolfo Silva, a citizen of the Republic of Mexico, who informed Ernest that he, Rodolfo, could arrange to get a divorce for the Goldens for a "little bit or nothing." The Goldens then went to another saloon with Silva who talked to several places by telephone. Silva then informed Ernest that "he thought he had the man." They all then repaired to a "lawyer's place" who said "he would do it for $50.00" which was apparently agreed to. This lawyer, one Victores Prieto, then prepared some papers in Spanish which were signed by both Ernest and Margaret, neither of whom could read Spanish. Margaret testified that these papers were not translated to the Goldens, though she testified she knew what was contained in the papers. The record is silent as to how she knew the contents of the papers. Ernest, Silva, and Prieto testified that the entire proceedings were interpreted in English. After a period of time, during which the Goldens were doing some shopping, they returned to the office of Prieto and accompanied him to a place which the lawyer said was the courthouse. The Goldens did not go into this place but waited outside for the lawyer. He came out in about one-half hour and the Goldens again accompanied him to a place in another building. In this place they were

given a couple of chairs, presumably to sit on, and they waited another half hour while their lawyer talked to some man. Neither was sworn to testify. It is claimed the divorce was a "consent" divorce, that is, a decree agreed to by both parties. The Goldens then accompanied Prieto to his office at which place he gave them some papers, which appellee in her testimony said was a copy of "that divorce." All parties then returned to El Paso, and went to Hot Springs, N. Mex., where the Goldens stayed that night living together as man and wife. Appellant claimed to be an American citizen at all times, voting about two months after the divorce was granted.

The trial court found the Goldens were at all times residents of and domiciled in Quay county, N. Mex., and at no time was either a resident of or domiciled in the Republic of Mexico.

We quote from the court's own findings, as follows:

"From all of the evidence introduced:

"The Court finds that the parties hereto were married in Clovis, Curry County, New Mexico, in September, 1932, and that the officer solemnizing the marriage was the Probate Judge of Curry County at the time.

"The Court further finds that there are no children issue of this marriage.

"The Court further finds that the plaintiff has sustained the allegations of her complaint.

"The Court further finds that in said Cause No. 5441, the defendant herein filed suit for divorce, alleging the existence of the marriage relation, and later dismissed the same.

"The Court further finds that in September, 1933, the defendant carried the plaintiff with him to the City of Juarez, in the Republic of Mexico, and that after a stay there of a few hours, the complaint for divorce was filed, and the decree of divorce was granted. The Court finds that at said time both of the parties to this action were residents of Quay County, and had been for a number of years prior thereto, and that neither of said parties was a resident of the Republic of Mexico, and that neither of said parties was ever, at any time, a resident of said country."

From which, among other things, the court concluded: "VI. That the purported divorce which defendant caused to be obtained in the Republic of Mexico is wholly null and void as a fraud upon the courts and laws of the State of New Mexico, and upon the laws and courts of the Republic of Mexico, and of the State of Chihuahua in said Republic of Mexico."

From the facts found, it is apparent that the Goldens were at no time domiciled in Juarez, Mex. Ernest Golden appeared at the office of the Municipal Presidency in Juarez and said that he was an actual resident of the city of Juarez, giving as his residence in said city the Hotel Koper, a place at which he never resided. This was done by him in order to fulfill the

requirement of article 24 of the divorce laws of the state of Chihuahua, Mex., which article is as follows: "Art. 24. Residence for the observance of Article 22 of the present law shall be acquired by the respective certificate issued by the Municipal Registry of the place."

Article 22, which relates to jurisdiction of the court to hear a suit for divorce, reads as follows: "Art. 22. Jurisdiction to hear a suit for divorce for cause lies in the Court of the plaintff's residence: And in an action for divorce by mutual consent the jurisdiction is fixed by the residence of either of the spouses."

Out of the recited facts arises the law to damn the validity of the Mexican divorce decree.

Jurisdiction over the subject-matter of divorce rests upon domicile. This is not only the law as established by the great weight of authority in the United States (note, 39 A.L.R. 677), but is the law in the state of Chihuahua, Mex., as clearly appears from article 22, supra.

We are not here concerned with the "full faith and credit" clause of the Constitution of the United States (art. 4, § 1), for that provision is not applicable to judgments of foreign countries, nor is our attention called to any treaty existing between the United States and Mexico dealing with questions of divorce. A decree of divorce rendered in one state may be impeached and denied recognition in another upon the ground that neither of the parties

had such domicile or residence at the divorce forum; and this, notwithstanding the recitals in the decree or record from the other state or county of the jurisdictional fact of domicile or residence. Cases in note, 39 A.L.R. 677. Neither of the parties had established a "residence" in Juarez, under any known definition of residence. They went to Juarez, Mex., for one sole purpose, to secure a decree of divorce, and then depart. They did not even take their automobile across the International bridge, but left it on the American side that they might quickly depart, which they subsequently did. They might just as well have transacted the entire proceedings by phone or mail from Tucumcari, N. Mex., and have saved the all night drive, in so far as the efficacy of their efforts amounted to the establishment of a residence in Mexico for the purpose of securing a divorce.

Both parties were amenable to the laws of the state of New Mexico. Ernest Golden who appeared at the offices of the Municipal Presidency and claimed to have established residence in Juarez within a short period thereafter voted in New Mexico, where residence is required by N.M. Const. art. 7, § 1, for a period of twelve months. If he had abandoned his residence in New Mexico and had established a pretended residence in Juarez, such bona fides would have been shown to be false and fraudulent by his subsequent voting, if not alone by the facts above recited. A fraud was committed on the Courts of Mexico and on the solicitude of the state of New Mexico for the marriage status. We deem it

needless to cite many authorities. They are collected in the annotation found in 39 A.L.R. 677.

The California case of Ryder v. Ryder, 2 Cal.App.(2d) 426, 37 P.(2d) 1069, 1070, decided November 26, 1934, rehearing denied January 24, 1935, is so closely akin to the instant case that we quote therefrom with approval:

"The general rule is that jurisdiction over the subject-matter of divorce rests upon domicile, or at least residence, of one of the parties, and a decree of divorce rendered in a foreign jurisdiction may be impeached and denied recognition upon the ground that neither of the parties had such domicile or residence at the divorce forum notwithstanding the recitals in the decree. Note, 39 A.L.R. 677, and cases cited. Neither recitals in the decree or consent of the parties can confer jurisdiction in the face of evidence that plaintiff in the divorce action did not have a bona fide residence. It is a general rule that domicile is changed from one place to another only upon the abandonment of the first place of domicile with the intent not to return and by taking up a residence in another place with the intention of permanently residing in that place. 9 R.C.L. 542. The first essential for the validity of a decree of divorce between parties is that it should be pronounced by a competent court of jurisdiction, and one of whom at least is a bona fide subject of that jurisdiction. Even in this country, where it is prescribed by the Constitution that full faith and credit must be given in each state to the judicial proceedings of another, it is well settled that the record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction, and, if the want of jurisdiction appears on the face of the record or is shown either as to subject-matter or the person, the record will be regarded as a nullity. Thompson v. Whitman, 18 Wall. (85 U.S.) 457, 21 L.Ed. 897. The rule is certainly as strong, if not stronger, when applied to a court of a foreign country. It would be unfair to the courts of Mexico to presume that it would have been a party to such a proceeding if it had known that neither plaintiff nor defendant therein had ever been in Mexico during the year 1933, that during all of the time in question defendant maintained his residence and his employment in California, and that plaintiff had never consented to submit to the jurisdiction of the Mexican courts.

"A foreign divorce obtained through simulated residence and not in good faith is open to attack in the state of the real matrimonial domicile, and the party sought to be bound by it may always impeach its validity and escape its effect by showing that the court which rendered it had no jurisdiction over the parties or the subject-matter, and the jurisdiction of such court may be controverted by extraneous evidence. Kadello v. Kadello, 220 Cal. 1, 29 P.(2d) 171; Delanoy v. Delanoy, 216 Cal. 27, 13 P.(2d) 719, 86 A.L.R. 1321;

Galloway v. Galloway, 116 Cal.App. 478, 2 P.(2d) 842; Broder v. Broder, 122 Cal. App. 296, 10 P.(2d) 182; Warren v. Warren, 127 Cal.App. 231, 15 P.(2d) 556, 560; Steinbroner v. Steinbroner, 30 Cal.App. 673, 159 P. 235; Fox v. Mick, 20 Cal.App. 599, 129 P. 972; Thompson v. Whitman, 18 Wall. (85 U.S.) 457, 21 L.Ed. 897; Hanley v. Donoghue, 116 U.S. 1, 6 S.Ct. 242, 29 L.Ed. 535.

"As was said in the case of Warren v. Warren, supra: 'A bona fide residence, however, is essential to jurisdiction, and a valid divorce decree cannot be founded upon a simulated domicile or a residence undertaken for the purpose of securing such a decree.'

"However, in the instant case it is apparent from the face of the record that a fraud had been perpetrated upon the courts of Mexico, for it is recited in the decree itself that 'said plaintiff had established his domicile in compliance with the existing laws,' and 'that the court's jurisdiction was established by the certificate of the plaintiff's domicile duly registered in the Public Registry.'

"There is nothing in the record to indicate what the law of Mexico is concerning divorce. We have been directed to no statute or code or other law of that country governing the subject of divorce. If, however, it be assumed that the laws of that country require no residence nor the presence of the parties within its territory as a basis of jurisdiction, and that the formal requirements established by Mexi-can law were met, then the divorce cannot be recognized under the laws of this state. A decree of divorce rendered by any jurisdiction in which neither of the parties have domicile is not entitled to full faith and credit and will not be recognized and enforced in California."

We quote from an early (1892) Wisconsin case with approval:

"It is conceded by both parties that the only question for determination is whether that decree of divorce is valid, and operated as a legal separation of Adolph and Elise at the time it was rendered.

"In this country it is prescribed by constitutional compact that full faith and credit must be given in each state to the public acts, records, and judicial proceedings of every other state; and yet it is well settled that the record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction, and, if want of jurisdiction appear upon the face of the record, or is shown either as to the subject-matter or the person, or, in proceedings in rem, as to the thing, the record will be regarded as a nullity. Thompson v. Whitman, 18 Wall. 457, 21 L.Ed. 897; Pennoyer v. Neff, 95 U.S. 714 [24 L.Ed. 565]; Simmons v. Saul, 138 U.S. 439, 11 S.Ct. 369 [34 L. Ed. 1054]; Bartlet v. Knight, 1 Mass. 401 [2 Am.Dec. 36]; Starbuck v. Murray, 5 Wend. [N.Y.] 148 [21 Am.Dec. 172]; Taylor v. Barron, 30 N.H. 78 [64 Am.Dec. 281]; Rape v. Heaton, 9 Wis. 328 [76 Am.Dec. 269]; Renier v. Hurlbut [81 Wis.

24] 50 N.W. 783 [14 L.R.A. 562], 29 Am. St.Rep. 850. The rule is certainly as strong, if not stronger, when applied to a judgment rendered in a court of a foreign country, towards which no such duty is enjoined, and especially where the jurisprudence of such foreign country is in no sense based upon the common law. * * * In speaking of the residence in this state essential to give the court jurisdiction, Ryan, C. J., aptly said: 'No mere pretense of residence, no passing visit, no temporary presence, no assumption of residence here pro hac vice only, nothing short of actual abode here, with intention of permanent residence, will fill the letter or the spirit of the statute.' Dutcher v. Dutcher, 39 Wis. [651] 658; Cook v. Cook, 56 Wis. [195] 206, 14 N.W. 33, 443 [43 Am.Rep. 706]. 'The legislature was legislating for the citizens of this state, not for others.' Id. [Dutcher v. Dutcher, 39 Wis. (651) 658]. These propositions are still more significant when applied to any statute, law, or custom of any foreign country like Sweden." St. Sure v. Lindsfelt, 82 Wis. 346, 52 N.W. 308, 309, 19 L.R.A. 515, 33 Am.St.Rep. 50.

In Newton v. Newton (May 22, 1935) 179 A. 621, 13 N.J.Misc. 613, a Mexican decree of divorce was obtained by the husband, whose sole purpose in going to Mexico, where he remained for less than a week, was to obtain a divorce. He and his wife had been residents of New Jersey for eighteen years. The court held that the Mexican decree of divorce was void, and that the wife was entitled to a divorce from the husband on the ground of adultery, he having after the entry of the Mexican decree married another woman and lived with her as his wife.

In the case of Wells v. Wells (May 30, 1935) 230 Ala. 430, 161 So. 794, 795, appellant went to Mexico for no other purpose than to obtain a divorce. The court said: "We note that the proceedings in the Mexico court do not recite that Mr. Wells was a resident of that republic. But had it done so, since that recital is of a fact essential to the jurisdiction of that court, it may be contradicted in this suit to show that the decree there rendered was null and void."

The decree which the Mexican court undertook to grant in the case at bar is wholly invalid. There is no claim that either Golden or his wife ever resided for any length of time, or had their marital domicile, in Mexico. Every fact in the case shows that Golden had no intention at any time of residing in Mexico, notwithstanding he registered as a resident of the state. He left his business at Tucumcari to go to Mexico to get a divorce. He left his car on the American side of the International bridge, in order that he might not be delayed in his return to his domicile. We know of no rule of law by which any validity at all could attach to the purported decree of divorce granted by the Mexican court. There is nothing in the public policy of this state that requires or suggests that a divorce granted under these circumstances should be recognized and given effect as a

dissolution of the matrimonial relations of parties whose matrimonial domicile is in this state. To give recognition and effect to such a divorce would be contrary to the public policy of this state.

▮ Paraphrasing (and applying to this case) the language of the Supreme Court of Mississippi in Miller v. Miller, 173 Miss. 44, 159 So. 112, the state of Chihuahua and the Republic of Mexico have the undoubted right to make such laws for the government of their own inhabitants as they may deem proper, and the courts of that state have the right to render judgments and decrees pursuant to such laws, fixing the rights, relations, and status of their citizens, but when such judgments or decrees, which affect or purport to determine the marital status and rights of citizens of this state, are contrary to the public policy of this state, our courts will determine for themselves the jurisdiction of that court to render such a decree or judgment, and the consequent validity thereof, and this notwithstanding the recitals of the decree of the jurisdictional facts of residence or domicile.

We are faced with a more serious problem, however, in view of the fact that the appellant contends that the appellee is estopped from attacking the Mexican decree. Nevertheless we hold, from the facts before us, the appellee is not estopped from attacking the judgment of the Mexican court in the instant case.

▮ Ordinarily, a party cannot invoke the jurisdiction of a court for the purpose of securing important rights from his adversary through its judgment, and, after having obtained the relief desired, repudiate the action of the court on the ground that the court was without jurisdiction.

This doctrine of estoppel to assert invalidity of a judgment proceeds upon the theory that it would be intolerable to permit the parties to enter into collusion to defraud the court, and, each of the parties having enjoyed the fruits of their wrongful conduct, to permit one of them to afterwards assail the judgment collaterally. See Freeman on Judgments, § 1438.

▮▮ However, neither the doctrine of estoppel, assuming that the appellee voluntarily appeared and submitted to the jurisdiction of the Mexican court, nor the rule which would deny to appellee the right to attack collaterally a decree which is apparently valid on its face, is applicable here.

"A decree of divorce may be impeached collaterally in the courts of another state by proof that the court granting it had no jurisdiction because of the plaintiff's want of domicil, even when the record purports to show such jurisdiction and the appearance of the other party." German Savings & Loan Society v. Dormitzer, 192 U.S. 125, 24 S.Ct. 221, 48 L.Ed. 373.

The Mexican divorce decree was void. It is as invalid as though it had been decreed by the probate judge who solemnized the marriage ceremony. It is as void as though it had never been issued. It can be disregarded anywhere. Its validity can be questioned in any suit where it is proposed

as valid, and appellee is not estopped to question it in this case any more than she would be denied the right to question a divorce granted appellant by a justice of the peace before whom both appeared and consented to a decree. To hold otherwise would permit couples impatient of marital restraints, and in moments of emotional impulses, irrespective of their duty to their children, their families, or the state, to cross over the International bridge to Jaurez, and by a mere flourish of the pen dissolve the matrimonial tie and then remarry at will irrespective of consequences. There may be no children of the body of the Goldens in the instant case concerned with the outcome. However, the rule we establish here would become a rule of construction and decision in the future.

The marriage status is not one which concerns the parties to the ceremony alone. New Mexico, though recognizing the validity of marriages which are celebrated beyond the limits of this state, and which are valid according to the laws of the country wherein they were celebrated or contracted (Comp.St.1929, § 87-105), considers only valid those marriages which are solemnized within this state in accord with our laws. In re Gabaldon's Estate (Gabaldon v. Gabaldon), 38 N.M. 392, 34 P. (2d) 672, 94 A.L.R. 980. The state of New Mexico, the children, and the parties to the marriages are all equally concerned in the marriage status. The parties cannot throw off their marital ties as they would a worn out pair of shoes. Proper machinery of the court is set up to sever the marital bonds when they become beyond endurance, and even then only on certain statutory grounds. In the operation severing the bonds of matrimony, all interested parties are placed under the jurisdiction of a court of competent jurisdiction that the rights of all may be protected. To permit a foreign state or Nation to assume jurisdiction over residents of this state and grant divorce upon request, like a slot machine in which you deposit a fixed sum of money, press the lever, and out comes a divorce decree, is a condition which New Mexico does not yet tolerate.

That the state is a party interested in the legality of the dissolution of the marriage status of its citizens is well supported by competent authority.

Ryder v. Ryder, supra, while denying the claim of estoppel, deals very briefly with the question, being content to hold that estoppel cannot confer jurisdiction over the subject-matter. However, a later California case, citing the Ryder Case, Kegley v. Kegley (Cal.App.) 60 P.(2d) 482, 484, treats the subject more fully and more satisfactorily, denying estoppel upon the broad ground of the state's public policy. The court said:

"All sovereignties jealously guard the status of its citizens and will resent any attempt of a foreign state to disturb the domestic relations of those residing within its borders. Therefore, before a state can lawfully presume to pass upon such a problem as here presented, one of the

parties at least must have been a bona fide resident therein. It is here claimed, however, that, the defendant having submitted in writing to the jurisdiction of the foreign tribunal, she cannot now be heard to question its authority. An action in divorce, however, is not an action between the parties alone; it is the theory, here at least, that there are three parties involved, the husband and the wife who represent their respective interests, and the state protecting the morals of the community, to see that neither by collusion nor connivance the status of marriage will be reduced to a matter of temporary convenience. If the state is a party, then of course neither plaintiff nor defendant could by consent confer jurisdiction upon the courts of Mexico over the third party, viz., the state, and, the state not having consented to the courts of Chihuahua passing upon the marriage status of those domiciled within its boundaries, the decree cannot be binding within its jurisdiction. Under the theory of appellant, a foreign state could enact a law that, merely upon the appearance of a dissatisfied husband or wife, a final decree could be granted merely by the making of a request, but such a revolutionary procedure we are sure would not be tolerated by the courts of California. Although the courts in such a proceeding would perhaps have jurisdiction of the individuals, they could not have jurisdiction of the subject-matter of the action, that is, the marriage relation, the status of the parties. The courts of this state also have sole and exclusive jurisdiction over the status of those domiciled within its boundaries. Delanoy v. Delanoy, 216 Cal. 27, 13 P.(2d) 719, 86 A.L.R. 1321. This case is itself a brief on the invalidity of the Mexican decree.

"The rule is also well settled that a decree of divorce may be attacked collaterally in the court of another state by proof that the court granting it had no jurisdiction because of want of domicile by the plaintiff even when the record purports to show such jurisdiction. That jurisdiction of the subject matter cannot be conferred by estoppel is declared in Lindsay-Strathmore Irrigation Dist. v. Superior Court, 182 Cal. 315, 187 P. 1056, and the many cases there cited. If the subject matter is not within the jurisdiction of the court, that defect cannot be supplied by consent or estoppel of the parties. Marin. Municipal Water District v. North Coast Water Co., 178 Cal. 324, 173 P. 473; Yore v. Superior Court, 108 Cal. 431, 41 P. 477."

Judge Cooley in the leading case of People v. Dawell, 25 Mich. 247, 12 Am. Rep. 260–268, was the first to emphasize the position of the state in such matters. He said: "But it is said that if the parties appear in the case, the question of jurisdiction is precluded. That might be so if the matter of divorce was one of private concern exclusively. But such is not the case under our laws, nor will it ever be until it comes to be understood that parties have the right to marry and unmarry at pleasure, and that if they choose to trade

spouses, it is the concern of nobody but themselves. Such an understanding would require a considerable change in the existing laws of this state. As those laws now are, there are three parties to every divorce proceeding; the husband, the wife, and the state; the first two parties representing their respective interests as individuals; the state concerned to guard the morals of its citizens, by taking care that neither by collusion nor otherwise, shall divorce be allowed under such circumstances as to reduce marriage to a mere temporary arrangement of conscience or passion."

In Hollingshead v. Hollingshead, 91 N.J. Eq. 261, 110 A. 19, 21, the Court of Chancery of New Jersey had before it for consideration a decree of divorce granted in Nevada. Vice Chancellor Buchanan presents strong argument against an estoppel, even where both parties participated in the procural of the decree. He said:

"Logically, of course, where an estoppel is claimed to exist against an assertion set up by one of the parties, the determination of the issue as to whether or not such party is estopped from asserting his contention precedes any inquiry into the issue upon the contention itself; and, if the estoppel be found to exist, the inquiry into the truth or falsity of the contention against which the estoppel exists is never reached. But in this case the answer to the claim of estoppel is not that the estoppel *does not* exist, but that it *cannot* exist.

"The contract of marriage is one which may not be dissolved or abrogated by the will of the parties; the state must consent and act to accomplish such dissolution. If the husband and wife signed an agreement purporting to terminate the marriage relation, it would, of course, be void, and neither party would be heard to claim that the other party was estopped from asserting its invalidity. The question of whether or not the acts of the litigant had or had not been such as to estop him from asserting the invalidity of the 'agreement'—whether or not the alleged estoppel *did* exist—would be precluded from consideration by the answer, and the fact, that it *could not* exist.

"So, too, if, instead of signing a mutual agreement of dissolution of the marriage, the parties had gone to the minister who married them and procured him to sign a certificate *purporting to divorce them.* Wherein is there any difference between the last hypothesis and what the parties in this case actually did? They went to a Nevada court and procured from it what purports to be a decree of divorce; the Nevada court, under the circumstances, having no more jurisdiction, power, or authority in the matter than the minister aforesaid would have had, and its decree being of no more value or validity than the minister's 'certificate' in the supposititious case.

"Is it not clear, therefore, that there *cannot* be any estoppel against the contention of complainant that the Nevada de-

cree is, as the Legislature has said, 'of no force or effect in this state'? To hold otherwise would obviously be to hold that spouses, residents of this state, may do in this way that which they are not and cannot be permitted to do, namely, divorce themselves without the consent and act of this state, through its sole constituted agent in that behalf, the Court of Chancery."

Chancellor Buchanan says, however, that it by no means follows "that a party who has obtained such a void decree will be granted relief in this court as though he or she had been guilty of no misconduct in regard thereto." He then lays down what we believe is a sound rule, to wit: "The true rule, then, would seem to be that, where a suitor comes into equity and asks for relief, notwithstanding a foreign decree of divorce, which, if valid, would be a bar to his or her suit, which decree is void for lack of jurisdiction, but which was obtained by the present complainant, equity will examine into all the facts, and will accord or refuse its aid upon general equitable principles, according to whether or not it deems it conscionable so to do."

The Hollingshead Case is very interesting and rather exhaustive. It is true in the Hollingshead Case the court dealt with a statute, but says: "Furthermore, the same result must needs be reached, irrespective of that legislation." See, also, Reik v. Reik, 109 N.J.Eq. 615, 158 A. 519.

That there are some leading cases against the view advanced here cannot be denied. See Ellis v. Ellis, 55 Minn. 401, 56 N.W. 1056, 1058, 23 L.R.A. 287, 43 Am.St.Rep. 514; Starbuck v. Starbuck, 173 N.Y. 503, 66 N.E. 193, 93 Am.St.Rep. 631; Smith v. Smith, 43 La.Ann. 1140, 10 So. 248, 251. However, it is the application of other equitable principles which control the denial or award of relief. It will be found to be the case in many decisions, if not most of them, seeming to apply the doctrine of estoppel to challenge the former decree that the civil effects of the second marriage have become "complete and indestructible," as said in Smith v. Smith, supra. For instance, in that case the second wife had brought her suit to recover "the marital fourth of his estate" from his former wife as guardian of the children of the former marriage.

In Starbuck v. Starbuck, the action was one brought by plaintiff as widow of William H. Starbuck, deceased, to recover dower in the real estate of which he died seized, and Ellis v. Ellis portrays a contest between the former wife and the one married following a reputed divorce from her over administration of his estate.

The decision in each of these cases can be explained upon the application of some well-known equitable maxim, such as that no one shall profit from his own wrong or that he who comes into equity must come with clean hands, without upholding the doctrine that the person denied relief was estopped by the former decree. Indeed, as Vice Chancellor Buchanan points out in Hollingshead v. Hollingshead, if the estop-

pel be sustained, inquiry into the equities is beside the point.

The Supreme Court of Minnesota in Ellis v. Ellis classifies the cases in which the question of jurisdiction may arise in the following language, to wit: "But when in the court of a state an action for divorce is brought, and a decree of divorce rendered, the court is presumed to have determined the facts essential to its jurisdiction, among them the residence of the parties. When, as between whom, and to what extent is such determination binding in the state in which the parties are in fact residents? The cases in which the question may arise may be divided into three classes: First, in proceedings between the state of the parties' actual residence and one of the parties; second, in proceedings between the parties in the state of their actual residence, where the divorce in the other state was procured on the application of one of them, the other not appearing in the action to procure it; third, in proceedings between the parties when both voluntarily appeared in the action in which the divorce was granted, and consented to the jurisdiction, or that the court might determine the facts on which the jurisdiction depended. In the second class of cases, since it was settled that a judgment of another state can be assailed on the ground of want of jurisdiction in the court to render it, the decisions have been practically uniform that the party who did not submit to the jurisdiction is not bound by the judgment."

Coming to the case before us, we hold that no estoppel confronts appellee's challenge to the validity of the decree. Upon the application of equitable principles, we see nothing aside from appellant's remarriage which may be relied upon as a ground for denying relief. In many, if not most, of the cases touching upon this question, a remarriage had occurred, yet that fact was not deemed sufficient to deny relief. The appellee received no material benefits under the purported decree of divorce in Mexico, and began her own suit for divorce within less than one year. This would hardly sustain a charge of laches or acquiescence.

■ We come now to the question of claimed error in the award of alimony. We are bound by the record before us. When the decree of divorce was granted by the trial court in the instant case, a very liberal sum of money was awarded the appellee. This award is claimed by appellant to be excessive. The court, pursuant to Comp.St.1929, § 68-506, awarded appellee the sum of $4,000, out of which sum she was to bear her own attorney's fees and the expense of this suit. The court found that the property of the appellant was worth the sum of $8,000.

■ The record before us discloses that at the beginning of the trial appellant's counsel sought to file an amended answer to the first amended complaint. A so-called plea in bar theretofore had been filed. Defense counsel contended that

the plea in bar was aimed only at the motion for alimony and attorney's fees, and that they thought the time to answer to the main action, the suit for divorce, would be tolled until action on the motion. But unfortunately for this contention, the answer in bar was filed before the motion for alimony, although the right to alimony and attorney's fees had been asserted in the complaint. The plea in bar apparently left undenied the allegations setting up grounds for divorce, including the claim that the property involved was community property.

The trial court did not permit the amended answer to be filed so that as the matter stands the appellee procured her divorce without offering proof of the grounds thereof, otherwise than by admissions through failure to deny. In view of such failure to deny the record shows, and in finding true the allegations of the complaint the court found, that the appellee and appellant were married September 4, 1932, approximately two years before the divorce proceeding was instituted in New Mexico; that at the time of the marriage the appellee was about eighteen years old; that during the marriage some community property was acquired. (The record is silent as to the amount of community property and the amount of separate property owned by appellant. This question was never decided by the court.) That no children were born of the marriage; that a few months after the marriage the appellant mistreated the appellee and brutally beat her; that she become

pregnant and that the appellant compelled her with force to take medicines and drugs with the avowed purpose of inducing an abortion against her will; that although the appellee begged her husband to permit her to have the child he forced her to undergo an operation which produced an abortion, by reason of which she was subjected to torture and suffering and for a period of time her life was endangered, during which time appellant failed to care for appellee or have her cared for; that the appellee is destitute and in ill health, and is in such physical and mental condition as to render it impossible for her to obtain steady employment for her support; that the appellee is also without means to employ counsel or prosecute the instant case.

Though there are other allegations of acts of cruel and inhuman treatment of the appellee by the appellant, and of acts of infidelity on the part of appellant (all of which are admitted by failure to deny), yet they are immaterial in a determination of the question presented as to the claim of excessive award of alimony.

There is one other fact disclosed by the record that merits consideration in determining whether the court abused its discretion in the award of alimony. The record discloses that all of the property of the appellant has been conveyed away. Appellant admits that this was done to avoid the payment of any judgment that might be awarded against him. The appellee, to collect the amount of the award,

will be compelled to engage in further litigation to establish her right. She is without means to do so. This element must have also been taken into consideration by the court in his award.

In view of the admitted facts, we cannot say that an award of $4,000 in a lump sum, out of a total estate of $8,000, part of which is community property, and out of which sum appellee has to pay attorney's fees, costs of the suit, and with which to support herself when she is destitute and in ill health, is an abuse of discretion. Cassan v. Cassan, 27 N.M. 256, 199 P. 1010. This award the court had authority to make even though it may not have been community property. Comp. St.1929, § 68-506.

It becomes unnecessary to determine whether the court erred in finding that the appellant had exercised undue influence and duress on the appellee in compelling her to go to Mexico.

For the reasons stated, finding no error, the judgment of the district court is affirmed. It is so ordered.

SADLER and BRICE, JJ., concur.

HUDSPETH, Chief Justice (concurring in part and dissenting in part).

I am in full accord with the holding of the majority that a probate judge has authority to perform the marriage ceremony, but am not able to concur in the affirmance of the judgment awarding $4,000 to appellee and her attorneys, nor in the ruling on the plea of estoppel.

A satisfactory solution of the divorce problem has not yet been found. Mr. Justice Swift, after administering the English divorce laws for seventeen years, lately pronounced them wicked and cruel. The Russians, at the other extreme, found their too liberal divorce laws unsatisfactory. Our own Legislature only a few years ago added "incompatibility" to the eight grounds for divorce theretofore existing (Laws 1933, c. 54). This is one of the grounds for divorce in Mexico. See Bethune v. Bethune (Ark.) 94 S.W.(2d) 1043, 105 A.L.R. 814. The main difference between voluntary divorces granted to residents of Mexico and divorces granted on the grounds of incompatibility under our statute is that the latter is a home product. It is in the province of the Legislature to make the law and establish the public policy with reference to divorce. The Catholic Chancellor who does not believe in divorce may assuage his conscience with the thought that if he carries out the will of the Legislature he will have performed his full duty under his oath of office. It is, I believe, generally conceded that if a judge permits his decision to be colored by his personal predilections or prejudices against a cause, a law, or a litigant, the result is likely to lend support to those who charge the courts with usurping the powers of the legislative branch of the government. Such seems to have been the case here. On no other theory can I reconcile the award of $4,000—one-half of

appellant's property—to appellee, who resided with him less than a year. Able counsel for the appellee in her complaint pictured the defendant as a brute, guilty of high crimes and misdemeanors. If guilty, he richly deserves punishment, but such punishment should come after conviction in a criminal court. It may be remarked, however, that two of the allegations of the complaint investigated, one charging that appellee was coerced into appearing in the Mexican court and consenting to the decree, and the other, that all the property was community property, proved to be without verity. But the learned chancellor evidently felt strongly on the subject of the allegations—remarked: "Considering the conduct of the defendant"—and apparently permitted his feelings to enter into the award to appellee. The recited facts in the majority opinion alone are sufficient to discredit the charge of coercion. The court, at the close of the final hearing, said: "The Plaintiff has introduced no proof to controvert the testimony of the Defendant, further than that that has been elicited on cross examination, and the Court will amplify to this extent in sustaining this motion of Defendant permitting them to put on this proof; it amounts to this, all before judgment, to permit the Defendant to allege that this was separate estate, and to submit proof in that particular."

The following are from the findings of fact requested by the appellee:

"V. That at the time of the marriage of plaintiff and defendant, the defendant was the owner of the following described real estate, situate in the City of Tucumcari, County of Quay, State of New Mexico, to-wit:

"Lots One (1) and Two (2) in Block One (1) of the McGee Second Addition to the town, now City, of Tucumcari, New Mexico. Lots One (1) to Six (6) in Block One (1) of the Barnes Addition to the town, now City, of Tucumcari, New Mexico. Adopted. Harry L. Patton, Judge.

"VI. Defendant was further the owner of certain personal property consisting of an automobile and of household furniture and camp equipment, he being then engaged in the occupation of a Tourist Camp in said City of Tucumcari, New Mexico. Adopted, Harry L. Patton, Judge.

"VII. That the reasonable value of the property so owned by the defendant is the sum of $8,000.00, exclusive of indebtedness thereon; and that defendant owned a considerable portion of said property at the time of the marriage of the parties hereto, but that the earnings from the marriage community have gone into, and have increased the value of said property, and that certain portion thereof is now community property. Adopted. Harry L. Patton, Judge.

"VIII. That the defendant is a strong, well and able bodied man, capable of earning a good support for himself and all who are dependent upon him, including the plaintiff. Refused. Harry L. Patton, Judge.

"IX. That the plaintiff is untrained and unskilled in any particular line of employ-

ment and is unable to earn for herself the reasonable or respectable living and has for a long time been dependent upon her relatives for her support. Refused, Harry L. Patton, Judge."

The appellant testified that there was no community property, testimony which, of course, the chancellor was at liberty to disbelieve, but the appelleee, the only other witness on this point, only claimed that the receipts of the business were $50 a week, and stated that she did not know what was paid to the help. After the overhead charges of the business and the family expenses were deducted [In re Winston's Will (Winston v. Fitch), 40 N.M. 348, 59 P. (2d) 904] and a reasonable amount allowed for the "rents, issues and profits" of the separate property on which the business was conducted—which adhere to the separate estate under our statute (Comp.Stat.1929, § 68-303)—taking into consideration that considerable money was spent by the parties in travel, there was necessarily very little, if anything, left out of the earnings of the community.

If the unsupported allegations of the complaint were sufficient to satisfy the divorce laws and the third party to the suit referred to in the opinion of the majority—the state—they certainly were not sufficient to meet the constitutional guaranties affecting criminal trials.

"It would not be just to convict a defendant by reason of a judgment obtained against him civilly by a mere preponderance of evidence." 15 R.C.L. 1004.

The taking of the appellant's property for alleged crimes would not be unlike the procedure inveighed against by Mr. Justice Field in the case of Windsor v. McVeigh, 93 U.S. 274, 280, 23 L.Ed. 914 (quoting Mr. Justice Story in the case of Bradstreet v. Neptune Ins. Co., Fed.Cas.No.1,793, 3 Sumn. 600, 601) as follows: " 'It is a rule,' said the learned judge, 'founded in the first principles of natural justice, that a party shall have an opportunity to be heard in his defence before his property is condemned, and that charges on which the condemnation is sought shall be specific, determinate, and clear. If a seizure is made and condemnation is passed without the allegation of any specific cause of forfeiture or offence, and without any public notice of the proceedings, so that the parties in interest have no opportunity of appearing and making a defence, the sentence is not so much a judicial sentence as an arbitrary sovereign edict."

Aside from the appellant, other parties are concerned. The hands of three women have touched funds involved in this cause, viz.: The first wife of appellant, who labored with him for a dozen years in the accumulation of the property, and died. Her children survive. The childless second wife, the appellee, who resided with appellant for less than a year, and who is now a party to this, the third divorce proceeding filed for the dissolution of this marriage—the first complaint having been filed February 7, 1933, five months and two days after the marriage. The third wife, who married appellant after

the Mexican divorce was granted, and who brought into the community some hundreds of dollars which went into betterments of the property. Appellee's counsel magnanimously stated, "We are perfectly willing that she have the $450," but the matter was overlooked in the drawing of the final decree and a lien fixed on all appellant's property in favor of the appellee.

If I do not mistake the meaning of the opinion of the court, the majority are in accord with the view that the alleged crimes should be given no weight in determining the amount of alimony. The basis of the court's rule affirming the award of $4,000 is not clearly stated. Reference is made to the illness and destitution of appellee, but the refusal of the chancellor to make requested finding IX, quoted above, indicates that he at least has misgivings as to these claims, having seen and heard appellee, and possibly thought these allegations were as wanting in verity as others more thoroughly investigated. If she had no property at the time of the trial, she was in no worse condition in that regard than when she married appellant. As pointed out in the majority opinion, the court's decision is setting a precedent. No doubt the same rule will apply to the rich as well as to this ignorant, ill-advised man with a capital of $8,000. It seems that a man may expect a decree in favor of the wife who has lived with him a year giving her one-half of his separate estate, whatever that may amount to, to be upheld in this jurisdiction. And if the feminist view, that the surviving husband should regard half of the community property on the death of his wife as a trust fund descending to her children, prevails in the minds of the court, then he may expect a decree giving to his helpmate of one year all of his separate property to be affirmed by this court. That is what the man in the street has come to call "the alimony racket." This allowance of alimony appears clearly to be an abuse of discretion.

Perhaps it will be well to take up the question of estoppel where the majority left off in the quotation from Ellis v. Ellis, 55 Minn. 401, 56 N.W. 1056, 1058, 23 L.R.A. 287, 43 Am.St.Rep. 514. That court held in that case that in the third class of cases, i. e., " * * * in proceedings between the parties when both voluntarily appeared in the action in which the divorce was granted, and consented to the jurisdiction, or that the court might determine the facts on which the jurisdiction depended," that the determination could not be contradicted. The court said: "But the parties do consent, and why should they be heard to complain of the consequences to them of what they have done? Why should they be permitted to escape those consequences by saying: 'It is true that by a false oath made by one of us, and connived at by the other, we committed a fraud in the Wisconsin court, and induced it to take cognizance of the case; but now we ask to avoid its judgment by proof of our fraud and perjury or subornation of perjury.' Because we do not think it can be done the parties must, so far as their individual interests are concerned, abide by the

judgment they procured that court to render."

In Curry v. Curry, 65 App.D.C. 47, 79 F. (2d) 172, 174, a case in which the court found that at the time the Nevada divorce was granted on appearance of both parties in that jurisdiction they were in reality residents of the District of Columbia, the Court of Appeals said:

"Where a party litigant has invoked the jurisdiction of a court, and the other party has voluntarily appeared and submitted thereto, it is not consonant with ordinary conceptions of justice for another court to countenance an attempt to repudiate that jurisdiction, particularly when such attempt involves considerable sums of money expended, and the unsettlement of domestic relations created under color of the judgment. Loud v. Loud, 129 Mass. 14; Chapman v. Chapman, 224 Mass. 427, 113 N.E. 359, L.R. A.1916F, 528; Parmelee v. Hutchins, 238 Mass. 561, 131 N.E. 443; Kaufman v. Kaufman, 177 App.Div. 162, 163 N.Y.S. 566; Kelly v. Kelly, 118 Va. 376, 87 S.E. 567; Harding v. Harding, 198 U.S. 317, 25 S.Ct. 679, 49 L.Ed. 1066.

"And, of course, this salutory principle is of general application, not confined to the active parties in matters of divorce, as in the cases above cited, for it can never lie with a litigant either by passive consent, or by affirmative action, to lead a court to find a fact justified and fit to be carried into judgment, and then to contend in another court that the same fact at the same time and within his own knowledge, was otherwise and competent to support a contrary judgment.

"For a consent decree, within the purview of the pleadings and the scope of the issues, is valid and binding upon all parties consenting, open neither to direct appeal nor collateral attack. 'A fortiori, neither party can deny its effect as a bar of a subsequent suit on any claim included in the decree.' Nashville, etc., Railway Company v. United States, 113 U.S. 261, 266, 5 S.Ct. 460, 462, 28 L.Ed. 971. And so, even where the consent decree is of an interlocutory nature. In re Metropolitan Railway Receivership [In re Reisenberg] 208 U.S. 90, 28 S. Ct.,219, 52 L.Ed. 403; Parish v. McGowan, 39 App.D.C. 184, 201."

See, also, the Restatement of Conflicts of Law, §§ 111, 112; Freeman on Judgments (5th Ed.) par. 1438; Annotation, 105 A.L. R. 817.

For the reasons stated, I dissent.

BICKLEY, Justice (concurring in part and otherwise dissenting).

I am in accord with the holding that a probate judge had authority to perform a marriage ceremony.

I think the award of alimony was excessive, but from the way the case was presented to the trial court, appellant is not entitled to relief.

I am unable to subscribe to the majority view that a party may practice a fraud on the courts of this state, then go into the courts of a neighboring Republic and there practice a fraud upon its courts,

and having enjoyed the fruits of her conduct, return to her own repudiated courts and find sanctuary for a plea to be allowed to profit by her own wrong. I doubt that the trial court committed itself to any such unusual doctrine.

As appraised by the majority opinion, the trial court found on request of appellee that appellant had exercised undue influence and duress on the appellee in compelling her to go to Mexico. The majority say it is unnecessary to pass on the correctness of this finding. I think it should have been passed on. This writer early in consideration of this case declared in conference that if this finding is sustained by substantial evidence, there would be nothing to appellant's claim that appellee is estopped to challenge the Mexican decree. I am authorized to say that a majority of the court think such finding is not supported by substantial evidence. That the trial court and appellee considered this finding material and vital is manifest. There is little to suggest that without it the decree complained of would have been rendered.

I think it proper to set forth some further reasons in explanation of my dissent.

It is urged that public policy requires that a decree of divorce entered without jurisdiction should be vacated. The argument would have much force if plaintiff was trying to sustain the status of wife to the defendant. It is for the purpose of sustaining the marital relations of the parties which impels the courts to say that for the protection of society the state is interested in the regularity of divorce proceedings. In the case at bar, plaintiff does not seek to sustain the marriage status, but seeks to further destroy it, and where there are no children involved, the state has no interest in the question whether the plaintiff accomplishes the termination of the marriage status through a court of her domicile or through courts of some other jurisdiction. See McGraw v. McGraw, 48 R.I. 426, 138 A. 188. When courts set aside or disregard decrees invalid because obtained by collusion or fraud, it is not out of regard to the parties concerned but from motives of public policy, and it should appear that the party moving is not acting merely for a mercenary purpose.

In Todd v. Rhodes, 108 Kan. 64, 193 P. 894, 896, 16 A.L.R. 423, the court said: "The motive for the assault upon the decree may well be a determining factor in case of doubt."

It is suggested that the plaintiff, in addition to her mercenary motive of securing alimony, had a right to invoke the equity jurisdiction of the courts of this state to procure a valid divorce. The divorce she had obtained in Mexico was valid in Mexico until set aside. She should have been relegated to a direct attack upon the judgment in the court which rendered it.

It is said that the public has an interest in the proper maintenance of the marriage

relation, and public policy forbids that the parties shall agree to its dissolution, or shall enter into any collusion to bring about that result. As Mr. Chief Justice HUDSPETH says, a satisfactory solution of the divorce problem has not yet been found.

Mr. Nelson, in his work on Divorce & Separation, at § 289, says: "Courts often comment upon the folly of refusing divorce to parties where they are irreconcilable and so alienated that a reunion will not take place, and the denial of divorce will cast them upon the world, in the dangerous position of husbandless wives, and wifeless husbands; and if the court had the discretionary power that courts of equity have in regard to other matters relating to kindred rights, it would be proper to grant a divorce. But in the absence of statutory permission, a divorce will not be granted because the parties are unable to live together."

Our 1933 Legislature molded the public policy in this state along the broad and liberal lines suggested by Mr. Nelson when there was imported into our statute a new ground for divorce, namely, "incompatibility." If the parties in good faith conclude that they are incompatible and cannot continue to live together as husband and wife, then, without the existence of any of the other grounds of divorce, the court may dissolve the marriage. I do not criticize this legislative policy. There are many who think it a wise one. There are many who hold to the theory that the state has as much interest to see an unhappy marriage terminated as it has to see a happy one endure. I agree with Mr. Chief Justice HUDSPETH that since the importation into our law of "incompatibility" as a ground for divorce, the so-called interest of society in preserving the marriage relation by making divorces difficult to obtain has very largely disappeared.

Since the plaintiff did not seek to restore the situation to the status quo ante, it is difficult to see how public policy is promoted by destroying the marriage relation existing between defendant and the woman whom he married after plaintiff had acquiesced for eight months in the Mexican decree, thus entangling her in a web of intolerable difficulties woven with the assistance of the unclean hands of plaintiff. This thought has found expression elsewhere.

The Georgia Supreme Court in McConnell v. McConnell, 135 Ga. 828, 70 S.E. 647, 649, refused to countenance the conduct of a husband who permitted his wife to obtain a decree of divorce without objection and without bringing to the attention of the court the fact that he did not reside in the county presided over by the superior court granting the decree. The Supreme Court called attention to the fact that the husband waited for nine months to bring a suit to set aside the decree, and went on to say: "In McNeil v. McNeil, 170 F. 289, 292, 95 C.C.A. 485, 488, the court said: 'The safety of so-

ciety imperatively demands that one who seeks to overthrow an apparently valid decree of divorce should proceed with the utmost promptness upon discovery of the facts claimed to show its invalidity. It must be apprehended that a man who has secured a decree of divorce, valid on its face, may endeavor to marry again, thus entangling some innocent woman in most intolerable difficulties, should the divorce be afterwards annulled. In such a case, one who seeks the aid of equity should, in limine, make it appear that she has proceeded in good faith and with reasonable diligence.' In this connection, see 2 Black on Judgments, §§ 929, 930; 2 Nelson on Divorce & Sep. §§ 1055, 1056; Bledsoe v. Seaman, 77 Kan. 679, 95 P. 576."

In Poston v. Delfelder, 39 Wyo. 163, 270 P. 1068, 1071, 273 P. 176, the court recognized the principle that jurisdiction of the subbject-matter cannot be conferred by consent, nevertheless deciding that a party consenting to a decree could not without claim of fraud or mistake have a decree vacated. The court quoted a note in 3 A.L.R. 535, as follows: "The party at whose instance a judgment is rendered is not entitled, in a collateral proceeding, to contend that the judgment is invalid. Neither want of jurisdiction, defect of procedure, or any other ground of invalidity can be availed of collaterally, by the party who is responsible for the existence of the judgment."

The court said that the principle on which the cases supporting this declaration rest is not technically the doctrine of estoppel, but that it is unimportant "whether the principle applied be described as estoppel, quasi estoppel, waiver, ratification, election, or as a requirement of consistency in conduct."

The Court of Appeals of New York in Starbuck v. Starbuck, 173 N.Y. 503, 66 N.E. 193, 194, 93 Am.St.Rep. 631, thought if it were important to find an element making the conduct of the party truly "estoppel," it could be found in some cases, saying: "If Starbuck had gone to that state and had contracted a marriage with a woman there, who acted upon the faith of the decree that the plaintiff had obtained, it may be that a question of estoppel would have been presented. Moore v. Hegeman, 92 N.Y. 521, 44 Am.Rep. 408. But we do not deem it necessary to determine that question at this time. We prefer to rest our decision upon the principle that the plaintiff, having invoked the jurisdiction of the Massachusetts court and submitted herself thereto, cannot now be heard to question the validity of its decree."

The court also said: "There are a number of cases in which the courts of this state have refused to recognize the validity of divorces obtained in other states upon grounds insufficient for that purpose in this state, when the defendant resided here and was not personally served with process and did not appear in the action. Matter of Kimball, 155 N.Y. 62, 49 N.E. 331; Williams v. Williams, 130 N.Y. 193,

29 N.E. 98, 14 L.R.A. 220, 27 Am.St.Rep. 517; De Meli v. De Meli, 120 N.Y. 485, 24 N.E. 996, 17 Am.St.Rep. 652; Cross v. Cross, 108 N.Y. 628, 15 N.E. 333; O'Dea v. O'Dea, 101 N.Y. 23, 4 N.E. 110. But in none of these cases did the party procuring the decree seek a benefit by having it held invalid. A party cannot avail himself of a defense or of a right to recover by means of an invalid decree or judgment obtained by him; but, on the other hand, he may not be heard to impeach a decree or judgment which he himself has procured to be entered in his own favor."

The foregoing decision was followed by the New York Supreme Court in Weber v. Weber (1929) 135 Misc. 717, 238 N.Y.S. 333, 335. The proceedings were similar to those in the case at bar. The court said: "Plaintiff contends and alleges in his complaint that the conduct of the parties constitutes a fraud upon the people of the state of New York, and upon its laws, because neither of the parties left the state of New York to obtain such decree. It may possibly be that such a fraud was committed, although I do not decide that question here, but it does not lie in the mouth of either of them to now cry 'fraud' when each of them was a party to such alleged fraud. It is a general fundamental maxim of the common law that no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity, or to acquire property by his own crime. Riggs v. Palmer, 115 N.Y. 506, 22 N.E.

188, 5 L.R.A. 340, 12 Am.St.Rep. 819; Kelsey v. Kelsey, 204 App.Div. 116, 197 N.Y.S. 371, affirmed 237 N.Y. 520, 143 N.E. 726. The plaintiff having appeared in the Mexican court proceeding, and later accepted benefits under the decree granted there, should not be permitted to come into a court of equity and endeavor to profit by his own wrong. The parties, having invoked the jurisdiction of the Mexican court, cannot now be heard to attack the decree of that court. See Starbuck v. Starbuck, 173 N.Y. 503, 66 N.E. 193, 93 Am.St.Rep. 631, and cases there cited."

A decision though on dissimilar facts is in principle applicable is Loud v. Loud, 129 Mass. 14. In that case a husband who had been married and was domiciled in Massachusetts left his wife there and went to Maine, where he straightway filed a libel for divorce. The wife appeared and later withdrew her opposition on being paid a substantial sum of money. A divorce was granted. The husband married again and the first wife brought against him a libel for divorce grounded on the cohabitation incident in this second marriage. It was said by Chief Justice Gray: "The conclusive answer to this libel is, that the wife not only appeared in the suit brought by the husband, but that she afterwards executed a release, reciting the divorce therein obtained by him, and for a pecuniary consideration discharging all her claims upon him or his estate. Having done this, she cannot treat his subsequent marriage and cohabitation

with another woman as a violation of his marital obligations to herself. The defence is allowed, not upon the ground of a strict estoppel, but because her own conduct amounts to a connivance at, or acquiescence in, his subsequent marriage."

In Carson v. Carson, 141 Okl. 106, 283 P. 1015, the court decided: "Party procuring divorce decree under 'verified petition setting forth jurisdictional facts respecting residence and accepting benefits thereunder is estopped from challenging court's jurisdiction."

The court quoted from the Ellis Case, cited by Mr. Chief Justice HUDSPETH in his dissenting opinion herein, as follows: "One reason why they ought not to be permitted, by going into another state and procuring a divorce, to escape accountability to the laws of their state, is that their act is a fraud upon the state, and an attempt to evade its laws, to which it in no wise consents, and it may therefore complain. But the parties do consent, and why should they be heard to complain of the consequences to them of what they have done? Why should they be permitted to escape those consequences by saying: 'It is true that by a false oath made by one of us, and connived at by the other, we committed a fraud in the Wisconsin court, and induced it to take cognizance of the case; but now we ask to avoid its judgment by proof of our fraud and perjury or subornation of perjury.' Because we do not think it can be done the parties must, so far as their individual interests are concerned, abide by the judgment they procured that court to render."

In the case at bar it appears that the plaintiff and defendant left Tucumcari and drove to El Paso, Tex., and thence to Juarez, Mex., with the intention of securing a divorce by the Mexican courts. They carried their marriage license along with them to be introduced in proof as part of their case. They set out upon this enterprise with an intention of practicing a fraud upon the courts of this state and accomplished that purpose. Why should one of the parties, after obtaining the benefits of the decree of the Mexican court secured by her connivance, and having returned to this state and acquiesced in that decree for eight months, during which interval her erstwhile spouse had remarried, be permitted to come into a court of equity and say: "It is true that I have practiced a fraud upon your court by going to Mexico and there practicing a fraud upon that court through false statements inducing it to take cognizance of the case and grant a divorce, but I forgot to ask for alimony, and although the defendant has since remarried, I ask you to disregard two of your controlling maxims,—that he who comes into equity must come in with clean hands, and that one will not be permitted to secure an advantage arising from his own wrong,— and give me a decree of divorce with alimony." I agree with Mr. Freeman's text, cited, that, "such a practice cannot be tolerated." Therefore, I dissent.